US WEST, INC.; US West Communications; US West Multimedia Communications, Inc., Plaintiffs–Appellees,

and

Washington Independent Telephone Association; Pacific Telecom, Inc. (PTI), and its Subsidiaries, Plaintiffs–Intervenors–Appellees,

v.

UNITED STATES of America; Federal Communications Commission; Janet Reno, Attorney General, Defendants–Appellants.

No. 94–35775.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 15, 1994.

Decided Dec. 30, 1994.

Amended Feb. 17, 1995.

**1094**

Douglas Letter, U.S. Dept. of Justice, Washington, DC, for defendants-appellants.

Louis R. Cohen and Lloyd N. Cutler, Wilmer, Cutler & Pickering, Washington, DC, for plaintiffs-appellees.

Deborah Johnson Harwood, Pacific Telecom, Inc., Vancouver, WA, for intervenor-appellee.

Richard A. Finnigan, Vandeberg, Johnson & Gandara, Tacoma, WA, for plaintiff-intervenor-appellee.

Bruce D. Sokler, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Washington, DC, for amicus.

R. Bruce Easter, Jr., Davis Wright Temaine, Seattle, WA, for amicus.

Kenneth S. Geller, Mayer, Brown & Platt, Washington, DC, for amicus.

Before: ALARCON and HALL, Circuit Judges, and KING, District Judge *.

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

**ORDER**

The motion of appellee Washington Independent Telephone Association to correct the opinion in this case is hereby GRANTED.

The opinion filed December 30, 1994, is amended in accordance with the opinion attached hereto.

**OPINION**

CYNTHIA HOLCOMB HALL, Circuit Judge:

US West, Inc. and several affiliated companies (hereinafter referred to collectively as "US West"), Pacific Telecom, Inc. and its subsidiaries ("PTI"), and the Washington Independent Telephone Association ("WITA") challenge the constitutionality of § 613(b) of the Cable Franchise Policy and Communications Act of 1984, Pub.L. No. 98–549, 98 Stat. 2785 (1984) (the "1984 Cable Act"). This provision, codified at 47 U.S.C. § 533(b), provides in pertinent part that:

(1) It shall be unlawful for any common carrier, subject in whole or in part to subchapter II of this chapter, to provide video programming directly to subscribers in its telephone service area, either directly or indirectly through an affiliate owned by, operated by, controlled by, or under common control with the common carrier.

(2) It shall be unlawful for any common carrier, subject in whole or in part to subchapter II of this chapter, to provide channels of communication or pole line conduit space, or other rental arrangements, to any entity which is directly or indirectly owned by, operated by, controlled by, or under common control with such common carrier, if such facilities or arrangements are to be used for, or in connection with, the provision of video programming directly to subscribers in the telephone service area of the common carrier.

47 U.S.C. § 533(b)(3) provides an exception to the ban for telephone companies providing service in rural areas. Furthermore, the Federal Communications Commission

("FCC") has the authority to waive the prohibition under certain conditions. 47 U.S.C. § 533(b)(4).

"Video programming" is defined in 47 U.S.C. § 522(16) as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." The FCC has interpreted § 522(16) to require a comparison of material to be provided by the telephone company with television broadcast programming in 1984: video services of the type broadcast in 1984 are "video programming" and therefore covered by § 533(b), whereas services or material not broadcast in 1984 are not covered by the cross-ownership prohibition.[1]

US West is a common carrier which provides local telephone service in 14 western and midwestern states. The company has applied for and been granted permission from the FCC to conduct a limited trial in Omaha, Nebraska, of "video dialtone service," which consists of constructing and making available transmission facilities for third parties' provision of video programming on a common carrier basis.[2] The FCC has concluded that such video dialtone services do not violate § 533(b) so long as the telephone company does not provide the programming material. *See First Video Dialtone Order*, 7 FCCRcd. at 5790. US West, PTI, and WITA, on behalf of numerous other Washington state local telephone companies, allege that they have or could quickly develop video dialtone facilities in numerous markets and would directly enter the video programming market in competition with local cable companies in their telephone service areas if the cross-ownership ban were removed. US West, PTI and WITA brought this constitutional challenge to § 533(b), claiming that the law violates the First Amendment both on its face and as applied, and asking that its enforcement be enjoined.

The district court granted summary judgment in favor of the plaintiffs. *US WEST, Inc. v. United States*, 855 F.Supp. 1184 (W.D.Wash.1994). The court rejected the government's contention that § 533(b) is a structural regulation of the telecommunications market that should be subjected only to rational basis review. It also declined to decide whether § 533(b) should be subject to strict scrutiny as a speaker- or content-based restriction. Instead, the district court found that the provision is unconstitutional even under the lower, intermediate scrutiny applied to content-neutral time, place, and manner restrictions and laws of general application which impose an incidental burden on speech. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The district court held specifically that § 533(b) is not sufficiently narrowly tailored to serve a substantial government interest.

Several other courts have recently had occasion to pass on the constitutionality of § 533(b), including one other court of appeals. All have found it invalid under intermediate First Amendment scrutiny. *See Chesapeake & Potomac Tel. Co. v. United States*, 42 F.3d 181 (4th Cir.1994) ("C & P"); *NYNEX Corporation v. United States*, No. 92–323–P–C (D. Maine Dec. 8, 1994); *Ameritech Corp. v. United States*, 867 F.Supp. 721 (N.D.Ill.1994); *BellSouth Corp. v. United States*, 868 F.Supp. 1335 (N.D.Ala.1994). We join those other courts in finding that § 533(b) unconstitutionally infringes on the plaintiffs' First Amendment right to free speech.

---

**1.** *In re Telephone Company–Cable Television Cross–Ownership Rules (Second Report and Order, Recommendation to Congress, and Second Further Notice of Proposed Rulemaking)*, 7 FCCRcd. 5781, 5820 (1992) (hereinafter *"First Video Dialtone Order"*); *see also In re Telephone Company–Cable Television Cross–Ownership Rules (Memorandum Opinion and Order on Reconsideration and Third Further Notice of Proposed Rulemaking)*, CC Docket No. 87–266, FCC 94–269 (released November 7, 1994), at ¶¶ 109–11 (affirming *First Video Dialtone Order* interpretation of "video programming") (*"Second Video Dialtone Order"*).

**2.** *See In re Application of US West Communications, Inc. for Authority Under Section 214 of the Communications Act of 1934, as Amended, to Construct, Operate, Own and Maintain Facilities and Equipment to Provide Video Dialtone Service in Portions of the Omaha, Nebraska Service Area*, Order and Authorization, released Dec. 22, 1993 (hereinafter *"Omaha Video Dialtone Order"*).

## REGULATORY AND STATUTORY BACKGROUND

The telephone-cable cross-ownership prohibition began as a rule adopted by the FCC in 1970, prompted by concerns that telephone companies, if permitted to provide cable services in their telephone service areas, would monopolize the field because they would discriminate against independent providers and in favor of their affiliates, in granting access to telephone poles and conduits.[3] A 1981 FCC report suggested that the pole access concerns underlying the ban no longer independently supported it, but recommended retaining the cross-ownership restriction due to other concerns, such as potential "cross-subsidization" of the telephone companies' cable operations from their monopolistic telephone operations.[4]

Congress adopted § 533(b) in 1984, as part of the comprehensive 1984 Cable Act. The Act contains no legislative findings concerning the cross-ownership ban. The only direct reference to the purpose of § 533(b) in the legislative history is a single sentence in a House report, indicating that the provision was intended "to codify current FCC rules concerning the provision of video programming over cable systems by common carriers." H.R.Rep. No. 934, 98th Cong., 2d Sess. 56 (1984) ("*1984 House Report*"). The report also stated that a number of cross-ownership provisions, all codified in § 533, were intended "to prevent the development of local media monopolies, and to encourage a diversity of ownership of communications outlets." *Id.* at 55.

When the FCC's *1970 Order* was adopted, the cable industry was in its infancy. At that time, fewer than ten percent of American households had access to cable television. *See First Video Dialtone Order,* 7 FCCRcd. at 5848. The FCC feared that the telephone companies could easily stifle competition and monopolize the industry. In 1984, when Congress enacted § 533(b), the industry had developed considerably, but concerns of monopolization by the telephone companies remained.

Since then, however, the nature of the cable television industry has changed enormously. By 1992, access to cable had surpassed ninety-one percent of households. *Id.* at 5855–56. Today, almost all cable providers have monopolies in their local markets. *See, e.g.,* Affidavit of Thomas W. Hazlett at ¶ 3 (only 2% of households have a choice between two competing cable systems).

In the Cable Television Consumer Protection and Competition Act of 1992, Congress specifically found that "most cable television subscribers have no opportunity to select between competing cable systems," resulting in "undue market power for the cable operator as compared to that of consumers and video programmers." Pub.L. No. 102–385, § 2(a)(2), 106 Stat. 1460, 1460 (hereinafter the "1992 Cable Act"). Congress also found that the "cable industry has become highly concentrated" and that the "potential effects of such concentration are barriers to entry for new programmers and a reduction in the number of media voices available to consumers." *Id.* § 2(a)(4). The five largest cable system operators in 1992 served over forty percent of all cable subscribers in the entire country. *See C & P Telephone Co. v. United States,* 830 F.Supp. 909, 915 (E.D.Va.1993), *aff'd,* 42 F.3d 181 (4th Cir.1994) ("*C & P District Court*"). In 1991, the largest, Tele-

---

3. *See Applications of Telephone Common Carriers for Section 214 Certificates for Channel Facilities Furnished to Affiliated Community Antenna Television Systems* (Final Report and Order), 21 F.C.C.2d 307, 323–25 (1970), *recons. in part,* 22 F.C.C.2d 746 (1970), *aff'd sub nom., General Telephone Co. of the Southwest v. United States,* 449 F.2d 846 (5th Cir.1971) (the *"1970 Order"*). For a more detailed discussion of the history of § 533(b) and its predecessors, see *C & P,* 42 F.3d at 186–88.

4. *See* FCC Office of Plans and Policy, *FCC Policy on Cable Ownership* 153–58, 162 (1981) ("*1981

FCC Report* "). Cross-subsidization involves improperly allocating common or joint costs of an unregulated activity (cable television) and a regulated activity (telephone service) to the regulated activity, in the hopes that the costs can be passed on to regulated ratepayers; and, at the same time, misallocating revenues from the regulated activity to the unregulated one. The combined effect of such practices would be to make the telephone companies' cable businesses unrealistically profitable and allow them to compete unfairly with the cable companies.

Communications, Inc., served 9.6 million subscribers and had revenues of $3.8 billion; the second largest, Time Warner, had 6.8 million subscribers and total revenues from all sources of $12 billion. *Id.*

Although the Justice Department vigorously defends the constitutionality of § 533(b) in this litigation, other elements of the government, including the FCC and the Antitrust Division of the Justice Department, have advocated its repeal.[5] In June 1994, the House of Representatives passed a bill which would have repealed § 533(b). The Senate Commerce Committee approved similar legislation, but the measure died when it did not come to a vote in the full Senate before the end of the session.

## STANDARD OF REVIEW

■■■ This court reviews the district court's grant of summary judgment de novo. *Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). Summary judgment is proper if, viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* The dispute about a material issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In ruling on a summary judgment motion, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511.

## DISCUSSION

### I.

The analysis of this case must be heavily influenced by the Supreme Court's recent decision in *Turner Broadcasting System, Inc. v. FCC,* —— U.S. ——, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). *Turner* was a challenge by cable television operators and programming providers to the "must-carry" provisions of the 1992 Cable Act. 47 U.S.C. §§ 534–35. These rules required most cable operators to set aside channel space to carry the signals of specified local commercial and public television broadcast stations. *See Turner,* —— U.S. at ——, 114 S.Ct. at 2453. The cable operators challenged the requirement arguing, among other things, that must-carry violated the First Amendment both because it constituted forced speech and because it reduced the number of channels they had direct programming control over. The cable programmers argued that must-carry infringed on their First Amendment rights by making it more difficult for programmers to compete for carriage on the remaining channels.

At the outset of its analysis in *Turner,* the Court stated unequivocally that:

> [t]here can be no disagreement on an initial premise: Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protec-

5. *See In re Telephone Company–Cable Television Cross–Ownership Rules (Further Notice of Inquiry and Notice of Proposed Rulemaking),* 3 FCCRcd. 5849, 5857–58 (1988) (the *"FNOI"*) (FCC concluded that the "cross-ownership restrictions appear to have accomplished their purpose of preventing telephone companies from establishing a monopoly position in cable television service that would have precluded the growth and success of an independent cable industry" and "tentatively conclude[d] that the costs of the cross-ownership ban exceed the benefits and that the public interest would be better served by a regulatory framework generally allowing telephone companies to provide cable television service subject to appropriate safeguards"); Reply Comments of the United States Department of Justice, *In re Telephone Company–Cable Television Cross–Owner-*

*ship Rules,* CC Dkt. No. 87–266 (Mar. 13, 1992), at 6 (*"DOJ Reply Comments"*) (concluding that "the Department believes the Commission should advise Congress to repeal the Cable Act's telephone company-cable television cross-ownership restriction"); National Telecommunications and Information Administration, U.S. Department of Commerce, *The NTIA Infrastructure Report: Telecommunications in the Age of Information* 230–35 (1991) (the *"NTIA Report"*) (concluding that § 533(b) should be repealed and noting that NTIA had advocated that position before Congress in 1990); *First Video Dialtone Order,* 7 FCCRcd. at 5847 (formally recommending that Congress repeal § 533(b)); *Second Video Dialtone Order* at ¶¶ 124–25 (affirming recommendation that § 533(b) cross-ownership ban be repealed).

tion of the speech and press provisions of the First Amendment.

*Id.* at ——, 114 S.Ct. at 2456. Section 533(b) burdens the plaintiffs' First Amendment rights by expressly prohibiting them from directly engaging in this form of speech within a certain area. The defendants and their *amici* do not appear to dispute this proposition.

## II.

■ Because § 533(b) implicates the plaintiffs' First Amendment rights, we must determine what level of scrutiny should be applied in our review of the provision. Not surprisingly, the parties disagree considerably on this question.

### (a) *Rational Basis Review*

The United States argues, as it did in the district court, that § 533(b) should be reviewed under the highly deferential, rational basis standard of *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) ("*NCCB*"), in which the Supreme Court upheld a cross-ownership rule prohibiting common ownership of a radio or television broadcast station and a daily newspaper located in the same market. *See also Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The Court held in *NCCB* that the newspaper-broadcast cross-ownership regulations were valid under the First Amendment as "reasonable means of promoting the public interest in diversified mass communications." *NCCB,* 436 U.S. at 802, 98 S.Ct. at 2115.

The government contends that § 533(b) is a similar market structure regulation, intended to promote competition in the cable industry by preventing the telephone companies from monopolizing the field. Since § 533(b) is not content-based, it concludes, this court should uphold the provision so long as it is "reasonable."

The government's argument, however, fails adequately to deal with the fact that *NCCB, Red Lion,* and other broadcast regulation cases are based on the "scarcity rationale," which makes them fundamentally different from other First Amendment cases. The Court emphasized in *NCCB* that "there is no 'unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish.'" *Id.* at 799, 98 S.Ct. at 2114 (quoting *Red Lion,* 395 U.S. at 388, 89 S.Ct. at 1806) (emphasis added). The basis for according the broadcast media less protection derived from the

> physical limitations of the broadcast spectrum ... Because of problems of interference between broadcast signals, a finite number of frequencies can be used productively; this number is far exceeded by the number of persons wishing to broadcast to the public. In light of this physical scarcity, Government allocation and regulation of broadcast frequencies are essential....

*Id.*

*NCCB* and *Red Lion* are distinguishable from the present case because the scarcity rationale does not apply to the cable television industry. In *Turner,* the Supreme Court held that the "application of the more relaxed standard of scrutiny adopted in *Red Lion* and the other broadcast cases is inapt when determining the First Amendment validity of cable regulation," because "cable television does not suffer from the inherent limitations that characterize the broadcast medium [and there is no] danger of physical interference between two cable speakers attempting to share the same channel." —— U.S. at ——, 114 S.Ct. at 2457. Thus, for example, two competing cable concerns could each run wires to every home in a community, giving consumers greater choices in service, without any risk of interfering with each other's signals.

The Court reaffirmed in *Turner* that the scarcity rationale drove its analysis in the broadcast cases and that it does not apply to the cable industry. Because the government fails convincingly to distinguish *Turner,* we reject the government's contention that § 533(b) should be analyzed under a rational basis test.

### (b) *Strict Scrutiny*

■ US West for its part urges us to apply strict scrutiny, arguing that § 533(b) operates as a content- or speaker-based re-

striction on speech. *See, e.g., Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988) (content-based regulation on political speech in a public forum must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end") (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). A law that burdens First Amendment rights on the basis of the content of the speech regulated must generally be subjected to strict scrutiny. That a regulation is content-based can in some cases be found from an examination of the plain language of the law itself. *See Turner,* —— U.S. at ——, 114 S.Ct. at 2459. Content-based discrimination may also be discerned from a finding that the regulation's "manifest purpose is to regulate speech because of the message it conveys." *Id.* at ——, 114 S.Ct. at 2461 (citing *United States v. Eichman,* 496 U.S. 310, 315, 110 S.Ct. 2404, 2408, 110 L.Ed.2d 287 (1990)). We find that § 533(b) is content-based under neither inquiry.

Section 533(b) regulates the provision of "video programming" by telephone companies. The FCC has interpreted the definition of "video programming" in § 522(16) to require a comparison between the material to be provided by the telephone company and broadcast television in 1984. *See First Video Dialtone Order,* 7 FCCRcd. at 5820. US West contends that the FCC will therefore be required to determine the applicability of § 533(b)'s ban to specific proposed video services on a "case-by-case [basis], based on a detailed examination of the content of the video communications at issue." US West Brief at 32. While conceding that the process contemplated by the FCC is facially *viewpoint*-neutral, US West relies on *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), and *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), for the proposition that government scrutiny of the content of speech triggers strict scrutiny regardless of whether there is any "evidence of an improper censorial motive." *Arkansas Writers' Project,* 481 U.S. at 228, 107 S.Ct. at 1727.

US West reads these cases too broadly. The Supreme Court in *Turner* canvassed in considerable detail its First Amendment precedents and noted that the "principal inquiry" in determining whether a regulation is content-neutral or content-based, "is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." —— U.S. at ——, 114 S.Ct. at 2459 (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. at 2754). Sections 533(b) and 522(16) are not "laws that by their terms distinguish favored speech from disfavored speech *on the basis of the ideas or views expressed." Id.* (emphasis added). Rather, the review of content required under § 522(16) appears to be limited to inquiring whether the *type* of programming at issue was broadcast on television in 1984. *See First Video Dialtone Order,* 7 FCCRcd. at 5820–23 (broadcast television was "one-way" in 1984—and this type of material is "video programming" under § 522(16)—whereas modern technology allows for "interactive" or "two-way" programming—which would not be proscribed "video programming"); *1984 House Report* at 41–44, 56–57. The determination of whether a given type of programming existed in the broadcast television medium in 1984 should end the inquiry, with no consideration of the ideas or views contained within the programs, and no room to favor or disfavor on the basis of content. *See C & P,* 42 F.3d at 193 ("that a regulation requires some examination of the speech upon which it has impact does not make the regulation content-based").

Nor is the "manifest purpose" of the cross-ownership ban "to regulate speech because of the message it conveys." What little legislative history there is for § 533(b) suggests that Congress' concern was to prevent the monopolization of the cable industry by the telephone companies. *See 1984 House Report* at 55. There is no indication that Congress intended to favor or disfavor any particular message.

US West further argues that § 533(b) should be subject to strict scrutiny because it is a "speaker-based" regulation which imposes unequal burdens on a distinct group of persons, namely the local telephone compa-

nies. *See, e.g., Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986) (citing *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978)); *League of Women Voters,* 468 U.S. at 384, 104 S.Ct. at 3119; *Buckley v. Valeo,* 424 U.S. 1, 48–49, 96 S.Ct. 612, 649, 46 L.Ed.2d 659 (1976) (government may not "restrict the speech of some elements of our society in order to enhance the relative voice of others"). The Supreme Court, however, rejected a largely similar argument in *Turner.*

The Court first flatly rejected the contention that all regulations distinguishing among speakers warrant strict scrutiny. *Turner,* — U.S. at —, 114 S.Ct. at 2467. Rather, it held that "speaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Id.* In effect, the Court thus collapsed the speaker-based inquiry into the content-based one. Because, as discussed above, Congress does not appear to have enacted § 533(b) based on the content of the telephone companies' or cable companies' speech, we also reject US West's speaker-based argument for strict scrutiny.

(c) *Intermediate Scrutiny*

The parties agree that if we reject rational basis review and strict scrutiny, then § 533(b) should be reviewed under intermediate scrutiny, as developed in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), *Ward,* and *Turner.* As discussed above, the Court in *Turner* rejected rational basis review and strict scrutiny for the must-carry provisions of the 1992 Cable Act. It emphasized, however, that "laws that single out the press, or certain elements thereof, for special treatment 'pose a particular danger of abuse by the State.'" *Turner,* — U.S. at —, 114 S.Ct. at 2458 (quoting *Arkansas Writers' Project,* 481 U.S. at 228, 107 S.Ct. at 1727), and therefore "are always subject to at least some degree of heightened First Amendment scrutiny." *Id.* The Court concluded that because "the must-

carry provisions impose special obligations upon cable operators and special burdens upon cable programmers," *id.,* "the appropriate standard ... is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech." *Id.* at —, 114 S.Ct. at 2469.

By the same token, § 533(b) imposes "special burdens" upon the telephone companies and confers considerable benefits upon the cable companies. We therefore follow the lead of the Supreme Court in *Turner* and apply intermediate scrutiny.

**III.**

Intermediate scrutiny asks if a challenged government regulation which is content-neutral:

> furthers an important or substantial governmental interest ... and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Turner,* — U.S. at —, 114 S.Ct. at 2469 (quoting *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679). In addition, a reviewing court should consider whether the regulation leaves open "ample alternative channels of communication." *Ward,* 491 U.S. at 802, 109 S.Ct. at 2760. As discussed more fully below, we hold that § 533(b) is not sufficiently narrowly tailored and therefore fails intermediate scrutiny.

(a) *Does § 533(b) further an important or substantial government interest?*

Legislation subject to intermediate First Amendment scrutiny must actually *further* the interests posited by the government. Thus, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner,* — U.S. at —, 114 S.Ct. at 2470 (citations omitted) (plurality opinion).

Courts must, however, "accord substantial deference to the predictive judgments of Congress." *Id.* at —, 114 S.Ct. at 2471. The *Turner* Court noted that "Congress is far better equipped than the judicia-

ry to 'amass and evaluate the vast amounts of data' bearing upon an issue as complex and dynamic as" cable television regulation. *Id.* (citing *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 331 n. 12, 105 S.Ct. 3180, 3194 n. 12, 87 L.Ed.2d 220 (1985)). Nonetheless, the fact that "Congress' predictive judgments are entitled to substantial deference does not mean ... that they are insulated from meaningful judicial review altogether." *Id.* Instead, the government must show that "in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." *Id.*

The evidence submitted in support of the cross-motions for summary judgment shows clearly that the government cannot make any such showing as to *Congress's* predictive judgments. The 1984 Cable Act contains no legislative findings relating to the cross-ownership provisions. *Compare id.* at ——, 114 S.Ct. at 2461 (1992 Cable Act contained "unusually detailed statutory findings" in which Congress explained the problems it found in the industry and the reasons for the solutions it adopted). Furthermore, the only legislative history directly addressing the purpose of § 533(b) consists of a single sentence in a House report noting that the section codified the existing FCC cross-ownership rule. *1984 House Report* at 56. Another sentence in the report stated that § 533 as a whole, which includes other cross-ownership restrictions, was intended "to prevent the development of local media monopolies, and to encourage a diversity of ownership of communications outlets." *Id.* at 55. This record suggests that Congress has made few "predictive judgments" about the purpose and operation of § 533(b) to which this court could defer.

Congress has over the last several years held numerous hearings on the cross-ownership ban and considered and failed to pass several bills that would have repealed it. Some committee reports have recommended repeal, whereas others have concluded that § 533(b) continues to make good policy sense. The government argues that this subsequent legislative history indicates that Congress has carefully considered the pros and cons of repealing the ban and has concluded that the provision remains useful.

■ "Failed legislative proposals," however, "are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'" *Central Bank v. First Interstate Bank,* —— U.S. ——, ——, 114 S.Ct. 1439, 1453, 128 L.Ed.2d 119 (1994) (quoting *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990)); *see also County of Washington v. Gunther,* 452 U.S. 161, 176 n. 16, 101 S.Ct. 2242, 2251 n. 16, 68 L.Ed.2d 751 (1981) ("We are normally hesitant to attach much weight to comments made after the passage of legislation. In view of the contradictory nature of these cited statements, we give them no weight at all.") (citation omitted). As discussed below, the arguments advanced by the government in support of the current utility of the cross-ownership ban appear to be weak. Additionally, Congress specifically found in 1992 that most cable operators currently have "undue market power," 1992 Cable Act, § 2(a)(2), 106 Stat. at 1460, a formal finding that casts doubt on the efficacy of a law the avowed purpose of which was to prevent concentration and encourage diversity of ownership in the cable industry.

■ A reviewing court must defer to congressional findings that a statute further its asserted goals. All that the government has proffered, however, are "failed legislative proposals" and recommendations in committee reports, which do not add up to a congressional finding that § 533(b) furthers any particular end. The government has therefore failed to produce sufficient evidence to suggest that there is any relevant congressional intent to which this court could defer.

■ An absence of explicit findings or other evidence of congressional intent does not of course end our inquiry. Agency interpretations of § 533(b), however, for the most part provide little support for the government's argument that the provision advances important interests. As discussed *supra* note 5, several federal agencies, including the FCC and the Antitrust Division of the Justice Department, have concluded that any

benefits of § 533(b) are outweighed by its anticompetitive effects and have advocated its repeal. Finally, we need give little deference to arguments advanced by Justice Department litigators in defense of the statute. *Cf. SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

Although it is a close question, we find that the government has nonetheless raised an issue of fact as to whether § 533(b) actually furthers the interests it purports to serve. The government argued in the district court that § 533(b) "serves to promote competition and to provide diversity of video programming because by keeping [telephone companies] out of the business of providing video programming in their telephone service areas, § 533(b) prevents potential anticompetitive behavior by the telephone companies." *US West,* 855 F.Supp. at 1191.

Fostering competition in the cable industry is a substantial government interest for First Amendment purposes. *See Turner,* —— U.S. at ——, 114 S.Ct. at 2469 ("promoting fair competition" in television markets "is an important governmental interest"); *id.* at ——, 114 S.Ct. at 2470 ("assuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order"). It is less clear, however, that § 533(b) furthers this interest. When it enacted the 1992 Cable Act, eight years after the 1984 Cable Act, Congress in fact found that the cable industry was excessively concentrated and that most cable operators did not face any competition. The government argues, however, that § 533(b) promotes competition in three ways. We find that upon closer examination, two of these rationales are not supported by the evidence. The government has, though, produced sufficient evidence on one to create a genuine issue of fact.

### 1. *Pole access*

The first way in which the government claims § 533(b) promotes competition and diversity of programming sources was also the original justification for the restriction in 1970, that the ban on provision of video programming removes any incentive the telephone companies might have to discriminate

in pole and conduit access. *See 1970 Order,* 21 F.C.C.2d at 324–36. By 1981, however, three years before Congress enacted § 533(b), an official FCC study concluded that the "problem of pole access does not by itself justify banning cross-ownership." *1981 FCC Report* at 162.

Congress has never expressly relied upon pole and conduit access to support the cross-ownership ban. It has, however, passed legislation regulating the manner in which telephone companies control and sell access to their poles and conduits. *See* Pole Attachment Act of 1978, Pub.L. No. 95–234, § 6, 92 Stat. 35 (1978), codified as amended at 47 U.S.C. § 224 (1988). Today, some ninety-eight percent of American homes have access to cable, so the importance of pole access has greatly diminished. *See FNOI,* 3 FCCRcd. at 5854 ("the necessary access to poles and conduit to permit the growth of the cable industry has generally occurred").

Furthermore, § 533(b) prohibits only the provision of video *programming,* but not the provision of video *transport* services by telephone companies on a common carrier basis. *See First Video Dialtone Order,* 7 FCCRcd. at 5823 (concluding that telephone company video dialtone service is permissible under § 533(b)); *Omaha Video Dialtone Order* at 19 (granting US West authority to construct and operate a limited video transport service in Omaha, Nebraska). Pole and conduit access is basically a transport concern, not a programming one. The FCC's conclusion that § 533(b) does not prohibit video transport by the telephone companies means that § 533(b) does nothing to deter pole access discrimination: even under § 533(b), the telephone companies can compete in the transport market and will have the same incentives, if any, to discriminate as if § 533(b) were not in effect. This seriously undermines any argument that the provision furthers the government's interest in preventing pole access discrimination. Even if, as the government suggests, monopolization of the programming market is a separate concern from monopolization of the transport market, there is no evidence in the record suggesting that pole access is a *program-*

*ming* concern. The government has not created a jury question on this point.

## 2. *Promotion of diversity*

The government next asserts that § 533(b) promotes diversity in the cable industry by stifling the "monopolistic tendencies which predispose [the telephone companies] to anticompetitive behavior." *US West,* 855 F.Supp. at 1192. At first glance, the notion that a prohibition on competition by the telephone companies actually *promotes* competition and diversity in the cable industry seems improbable. While the telephone companies may have posed a serious threat to the nascent cable industry in 1970, when the cross-ownership ban was first adopted, the situation is far different in 1994. Today, cable television is a multi-billion dollar business, and cable providers have service monopolies in virtually all communities.

The FCC found in the *First Video Dialtone Order* that "the risks of anticompetitive conduct by the local telephone companies in connection with the direct provision of video programming have been attenuated by the enormous growth of the cable industry" and that "there is little threat that the local telephone companies could preemptively eliminate competition and monopolize the market for video programming." 7 FCCRcd. at 5848–49; *see also id.* at 5848 & n. 352 (noting that the cable operators are not "a fledgling industry unable to compete," and that many potential competitors argue that the cable monopolies prevent adequate public access to video programming and stifle diversity in video services). The agency concluded that its goals of promoting competition and increasing the diversity of services available to the public would therefore be served by eliminating the cross-ownership restriction and allowing the telephone companies to compete with the cable industry. *Id.* at 5847; *see also Second Video Dialtone Order* at ¶ 265 (given the "enormous growth" of the cable industry, "the risk of telephone companies preemptively eliminating competition in the video marketplace has lessened significantly" and any remaining risk should be "addressed through our video dialtone framework and other appropriate regulatory safeguards"). The An-

titrust Division of the Justice Department concurred, arguing that "[a]llowing telephone companies to own and directly provide video programming in their local exchange areas, subject to Commission safeguards, will have procompetitive benefits that outweigh any anticompetitive risks involved." *DOJ Reply Comments* at 6–7; *see also NTIA Report, supra* note 5.

The government now argues, however, that even if the cable companies are financially strong today, the telephone companies would in the long run use superior financial strength and unfair competitive practices to achieve a monopoly. The government has not, however, submitted any *evidence* tending to prove this proposition. Congress itself has not explicitly based the continuation of the cross-ownership ban on this ground, and several executive branch agencies have explicitly rejected it in calling for the repeal of § 533(b). Thus, this argument about long-term competitive risks appears only to have been expressly adopted by the Justice Department litigators in the various cases challenging § 533(b).

The long-term competitive effect of telephone company entry into the cable industry would normally present a strong case for judicial deference to the "predictive judgments" of Congress. Because Congress has not really made any judgments in this area, however, this court must exercise its responsibility to engage in independent judicial review. *Turner,* —— U.S. at ——, 114 S.Ct. at 2471 (plurality opinion). We hold that the government has not created a genuine issue of fact on this question.

## 3. *Cross-subsidization*

Another concern expressed by the FCC, in its 1981 Report, was that telephone companies competing in the cable market would unfairly "cross-subsidize" their cable operations with profits from their regulated, monopolistic telephone operations. *See 1981 FCC Report* at 154–56. Again, Congress did not specifically mention this rationale when it enacted § 533(b). In its recommendation to Congress that § 533(b) be repealed, the FCC concluded that "existing safeguards ... constitute an effective means of preventing

cross-subsidization." *First Video Dialtone Order,* 7 FCCRcd. at 5828–29; *see also* Brief *amicus curiae* of the United States Telephone Association at 27–28 (noting that in the AT & T divestiture proceedings, the Justice Department has argued that existing regulatory safeguards *are* sufficient to prevent cross-subsidization by the regional telephone companies). These "existing safeguards" include comprehensive rules adopted in 1987 for allocating the joint costs of regulated and nonregulated activities.[6]

The cross-subsidization rationale also suffers from the same weakness as the pole access rationale, stemming from the fact that § 533(b) allows the telephone companies to compete in the video transport market. To the extent that a telephone company would be tempted to cross-subsidize, a substantial proportion of the costs it would improperly allocate would likely come from the construction of its video dialtone platform and transportation network, which has many costs in common with the companies' telephone businesses, and not from video programming, which does not.

The government submitted evidence, however, suggesting that such existing FCC safeguards are insufficient to prevent cross-subsidization, and that the structural solution of § 533(b) is therefore necessary. The General Accounting Office has expressed concerns that existing safeguards may not be sufficient, or sufficiently enforceable given FCC resources, to contain cross-subsidization. *See* General Accounting Office, *Telephone Communications: Controlling Cross–Subsidy Between Regulated and Competitive Service* 11, 55 (1987); General Accounting Office, *Telecommunications: FCC's Oversight Efforts to Prevent Cross–Subsidization* 2, 4, 5, 7–12 (1993). The government also submitted an affidavit in opposition to summary judgment that disputes the plaintiffs' argument about the importance of the transport/programming distinction. *See* Affidavit of Bruce M. Owen (arguing that allowing the telephone companies to compete in the video transport market would create *additional* in-

centives to cross-subsidize). In light of this conflicting evidence, we conclude that the government has created an issue of fact on the cross-subsidization argument.

In sum, we conclude that the government has submitted sufficient evidence to create an issue of fact as to whether § 533(b) promotes competition in the cable industry by reducing incentives to cross-subsidize. This factual issue, however, does not suffice to defeat summary judgment because it is not *material* for summary judgment purposes in light of our finding below that § 533(b) fails the narrow tailoring requirement. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

(b) *Is § 533(b) sufficiently narrowly-tailored?*

Discussion of the narrow tailoring requirement must begin, once again, with the Court's recent decision in *Turner.* The Court reaffirmed that under intermediate scrutiny, "a regulation need not be the least speech-restrictive means of advancing the Government's interests." —— U.S. at ——, 114 S.Ct. at 2469. The Court reformulated this conclusion in two different ways, and each side of this litigation seizes upon one of the formulations. The government stresses that a regulation need only "promote[ ] a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quoting *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758). The plaintiffs, on the other hand, argue that the means chosen must "not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758).

 Section 533(b) is a complete ban on a protected form of speech by US West in a fourteen-state area, by PTI in an eleven-state area, and by the members of WITA

**6.** *Separation of Costs of Regulated Telephone Service from Costs of Nonregulated Activities,* 2 FCCRcd. 1298, *reconsidered,* 2 FCCRcd. 6283 (1987), *further reconsideration,* 3 FCCRcd. 6701

(1988), *aff'd sub nom. Southwestern Bell Corp. v. FCC,* 896 F.2d 1378 (D.C.Cir.1990) (the *"Joint Cost Order"*).

within their telephone service areas. Such sweeping prohibitions are "suspect." *Edenfield v. Fane*, — U.S. —, —, 113 S.Ct. 1792, 1803, 123 L.Ed.2d 543 (1993) (quoting *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963)). It seems difficult to conclude that § 533(b) is narrowly tailored under either formulation of the requirement. Although a court should not, of course, invalidate legislation simply because it thinks a better law could have been enacted, it must nevertheless consider whether alternative solutions would achieve the government's goals with less restriction on protected speech. *See City of Cincinnati v. Discovery Network*, — U.S. —, — n. 13, 113 S.Ct. 1505, 1510 n. 13, 123 L.Ed.2d 99 (1993) ("if there are numerous and obvious less-burdensome alternatives to the restriction ... that is certainly a relevant consideration in determining whether the 'fit' between the ends and means is reasonable").

The plaintiffs submitted substantial evidence tending to show that the procompetitive goals of § 533(b) can currently be achieved through a variety of less speech-restrictive means. *See, e.g., First Video Dialtone Order*, 7 FCCRcd. at 5850 (concluding that both "structural separation" requirements less drastic than § 533(b)'s complete ban and various "nonstructural safeguards" would suffice to prevent anticompetitive behavior should Congress repeal § 533(b)). The government submitted no probative evidence to the contrary in response to the plaintiffs' summary judgment motions. To the extent that pole and conduit access remains a problem, for example, the government has submitted no evidence that shows why the Pole Attachment Act of 1978 does not sufficiently address the problem or could not be strengthened if necessary. *See C & P*, 42 F.3d at 200 ("If discriminatory pole access were the sole concern of Congress in enacting a prophylactic ban on a telephone company's ability to speak through video programming, then such a ban would plainly burden more speech than necessary....") (quoting *C & P District Court*, 830 F.Supp. at 930 n. 29); *see also Second Video Dialtone Order* at ¶ 285 (requesting comments regarding whether FCC pole and conduit access

rules should be modified in video dialtone context).

The FCC's *Joint Cost Order* contains comprehensive cost allocation and accounting rules to combat cross-subsidization. The parties and various government agencies disagree as to how effective such rules are, and we found above that the government created an issue of fact as to whether § 533(b) actually prevents cross-subsidization. But even so, the government has not shown that existing or potential nonstructural rules are so ineffective as to justify a sweeping ban on speech as the only alternative. In its *First Video Dialtone Order*, the FCC made clear that it would assess the adequacy of existing safeguards in conjunction with each telephone company video dialtone proposal, 7 FCCRcd. at 5827, and would reevaluate its rules and regulations as a whole three years into the experiment to determine their effectiveness in light of actual experience. *Id.* at 5833; *see also Second Video Dialtone Order* at ¶¶ 146–223 (concluding that existing rules should suffice to control cross-subsidization of video dialtone services by telephone companies). The government does not show why this more speech-friendly plan would be ineffective.

In its recommendation to Congress that § 533(b) be repealed, the FCC suggested that telephone companies be allowed to compete in the video programming market, and that monopolization could be avoided in part by requiring that a portion of their transport volume be set aside for sale to unaffiliated third parties on a common carrier basis. *First Video Dialtone Order*, 7 FCCRcd. at 5850–51. The FCC also noted that requiring that "the telephone companies provide video programming through a structurally separated video programming subsidiary," *id.* at 5847, would further reduce the risk of anticompetitive behavior. Such arrangements would help ensure that the telephone companies do not develop monopolies in the programming market, while allowing them to engage in considerably more protected speech. *Accord C & P*, 42 F.3d at 201–02. The FCC recently reaffirmed its conclusion that such safeguards would promote diversity while allowing the telephone companies to

compete in the video programming market. *Second Video Dialtone Order* at ¶¶ 261–67.

Finally, the government has not shown that, in the current state of the cable industry, the general antitrust laws could not be strictly enforced in order to safeguard competition. The *C & P* district court noted, and we agree, that the "federal agencies charged with enforcement of the antitrust laws stand ready to guard against anti-competitive behavior in the video programming market, just as in any other industry." 830 F.Supp. at 931.

In the face of such significant evidence suggesting that § 533(b) is not narrowly tailored, the government must come forward with enough contrary evidence of its own to create a triable issue. On the basis of the record before us, we must conclude that it has failed to do so.

The government places much weight on the fact that Congress has considered and rejected several reform or repeal proposals in recent years and argues that this court should defer to the "implicit" congressional finding that no less restrictive alternatives would accomplish its goals. US West correctly responds, however, that the Supreme Court has often stated that "Congressional inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction." *LTV Corp.*, 496 U.S. at 650, 110 S.Ct. at 2678 (quoting *United States v. Wise*, 370 U.S. 405, 411, 82 S.Ct. 1354, 1359, 8 L.Ed.2d 590 (1962)). We do not accept evidence of congressional *inaction* as persuasive evidence, sufficient to raise a genuine issue of material fact, of Congress's having "found" anything. We therefore hold that the government has failed to create a genuine issue of fact regarding whether § 533(b) is narrowly tailored. We hold that it is not.

(c) *Does § 533(b) leave open ample alternative channels of communication?*

Section 533(b) prohibits telephone companies from directly providing "video programming" to their own local telephone subscribers. The provision leaves open, however, opportunities to communicate with local subscribers through other media; to provide video programming indirectly by contracting with other cable carriers; to carry other programmers' material through "video dialtone" service; and to engage freely in any video programming activity outside its telephone service area. In light of our holding that § 533(b) fails the narrow tailoring requirement, we find it unnecessary to decide whether these alternatives constitute "ample alternative channels of communication" for intermediate scrutiny purposes.

## CONCLUSION

Section 533(b) fails the narrow tailoring requirement of the intermediate scrutiny test. Accordingly, we hold that the statutory provision is invalid under the First Amendment. The district court's grant of summary judgment in favor of the plaintiffs is therefore AFFIRMED.