**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

MARK TRAVIS BROWN,
            *Claimant-Appellant,*

v.

TRW RIFLE 7.62X51MM CALIBER,
One Model 14 Serial 593006,
            *Defendant.*

No. 04-16049

D.C. No.
CV-02-00264-RCC

OPINION

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted
February 15, 2006—San Francisco, California

Filed May 5, 2006

Before: Procter Hug, Jr., Arthur L. Alarcón, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

## COUNSEL

Richard E. Gardiner, Fairfax, Virginia, for the appellant.

Paul K. Charlton, United States Attorney, Reese V. Bostwick and Robert L. Miskell, Assistant United States Attorneys, Tucson, Arizona, for the appellee.

## OPINION

McKEOWN, Circuit Judge:

When is a rifle a machinegun? This appeal asks whether the rifle seized by the Bureau of Alcohol, Tobacco, and Firearms ("ATF") from Mark Brown is a "machinegun" within the meaning of the National Firearms Act, 26 U.S.C. § 5845(b). The definition of a machinegun under § 5845(b) includes a weapon that "can be readily restored to shoot, automatically more than one shot . . . by a single function of the trigger." The classification is important because federal law requires registration of machineguns. 26 U.S.C. § 5841. Although the rifle was a modified M-14 machinegun and could not fire automatically when purchased by Brown, it could be "readily restored" to shoot automatically within the plain and unambiguous meaning of § 5845(b). We thus affirm the district court's order of forfeiture.

**BACKGROUND**

Brown purchased a rifle from MK Specialties ("MKS"), a firearms dealer that remanufactures and sells decommissioned military M-14 machineguns. The military decommissions the M-14 by torch-cutting its receiver—the frame portion of the rifle that contains the firing mechanisms, located between the barrel and the stock—into two pieces. It is undisputed that before it is decommissioned, the M-14 is a machinegun within the meaning of § 5845(b).[1] MKS takes these M-14 pieces and remanufactures them by welding the two halves back together and performing some other alterations such that the resulting rifle, called an MKS M-14A, does not fire automatically— i.e., "more than one shot, without manual reloading, by a single function of the trigger." § 5845(b).

Brown purchased an MKS M-14A and attempted to sell it to a federal firearms licensee, West of Pecos, in Tucson, Arizona. The manager of West of Pecos was hesitant to purchase the rifle, and instead contacted the ATF to inquire about the rifle's classification. In response to the inquiry, ATF Special Agent Robert Lowery contacted Brown and verified that he was in possession of the rifle. Soon after, Special Agent Lowery learned from the ATF's Firearms Technology Branch that, after examination, other MKS M-14As were determined to be machineguns within the meaning of § 5845(b).

Special Agent Lowery verified that the rifle was not registered to Brown or any other person, as required by § 5841, and seized the rifle on May 8, 2001, under the authority of 26 U.S.C. § 5872(a). The United States then filed a civil forfeiture action on May 23, 2002, pursuant to § 5872(a). In preparation for the forfeiture action, ATF Special Agent Richard Vasquez, through the ATF Firearms Technology Branch, pre-

---

[1]The United States has classified the M-14 rifle as a machinegun since 1958. IRS Rev. Rul. 58-417. Brown does not dispute that the M-14 is a machinegun.

pared a comprehensive report in which he concluded that the rifle was a machinegun as defined in § 5845(b). The district court agreed and ruled in favor of the United States on summary judgment.

## ANALYSIS

[1] The central question in this appeal is whether the rifle is a "machinegun" under § 5845(b), which provides:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.

The parties dispute whether the rifle can be "readily restored" within the meaning of § 5845(b).[2]

As a threshold matter, the parties also dispute the relative burdens applicable in a forfeiture action. In an opinion issued last month, the Sixth Circuit carefully analyzed the burden question in a similar appeal and persuasively reasoned that the customs laws, 19 U.S.C. §§ 1602-1631, dictate the relative burdens of the parties in a forfeiture action under § 5872(a). *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 418-19 (6th Cir. 2006).[3] Section 1615 of the

---

[2]In its present state, the rifle does not "shoot automatically." We express no opinion as to whether the rifle is "designed" to shoot automatically as contemplated by § 5845(b). We note, however, that longstanding ATF rulings dating to 1982 provide that "designed to shoot" under § 5845 includes weapons that "possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts." *See* ATF Rul. 82-2, 1982-1 A.T.F.Q.B. 18 (1982); ATF Rul. 82-8, 1982-2 A.T.F.Q.B. 49 (1982); ATF Rul. 83-5, 1983-3 A.T.F.Q.B. 35 (1983).

[3]Most civil forfeiture actions are governed by the Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. § 202 (codified in part at 18 U.S.C. § 983). Section 983 is not applicable, however, to this

customs law provides that in forfeiture suits "where the property is claimed by any person, the burden of proof shall lie upon such claimant; . . . *Provided*, That probable cause shall be first shown for the institution of such suit or action . . . ." *See also United States v. One 56-Foot Yacht Named Tahuna*, 702 F.2d 1276, 1281 (9th Cir. 1983); *One TRW*, 441 F.3d at 419. Under § 1615, the claimant's burden may be met in one of two ways: "first, [the claimant] may refute the government's showing of probable cause, and second, [the claimant] may come forward with affirmative evidence and prove, by a preponderance of the evidence, that the [property subject to the forfeiture proceeding] was not used for the illegal purpose as alleged." *Tahuna*, 702 F.2d at 1281. Brown does not dispute that the ATF had probable cause to seize the rifle and institute forfeiture proceedings. Nor has Brown proven by a preponderance of the evidence that the rifle was not subject to forfeiture. Regardless of the burden of proof issue, this case turns on the construction of § 5845(b). Based on our construction of "readily restored" and the undisputed facts on the record, we have no doubt that the rifle is subject to forfeiture under § 5872(a).

**[2]** "Our analysis begins with the language of the statute. . . . When interpreting a statute, we must give words their 'ordinary or natural' meaning." *Leocal v. Ashcroft*, 543 U.S. 1, 8-9 (2004) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)). Congress did not define what it meant by "readily" or "restored" in § 5845(b); "thus, we follow the common practice of consulting dictionary definitions to clarify their ordinary meaning[ ]" and look to how the terms were defined

---

ATF weapons forfeiture action commenced under § 5872(a) of the Internal Revenue Code of 1986. § 983(i)(2)(B); *see also* 18 U.S.C. § 3051(c)(1) (subject to certain exceptions, "the provisions of the Customs laws relating to (A) the seizure, summary and judicial forfeiture . . . shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under any applicable provision of law enforced or administered by the Bureau of Alcohol, Tobacco, Firearms, and Explosives.").

"at the time [the statute] was adopted." *United States v. Carter*, 421 F.3d 909, 911 (9th Cir. 2005); *see MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 228 (1994) (stating that "the most relevant time for determining a statutory term's meaning" is when the statute became law, and relying on dictionaries to ascertain the term's meaning). Brown argues, and we agree, that "readily" and "restored" both have plain and unambiguous ordinary meanings as found in the Webster's dictionary that was in existence when Congress enacted § 5845(b) in 1968. Where we depart from Brown, however, is in our conclusion that the uncontested facts of this appeal fall within the scope of those ordinary meanings.[4]

We begin with the word "readily." Webster's Third, the edition in print when § 5845(b) was enacted, gives three alternate definitions for "readily":

> a: with prompt willingness: without hesitating, quibbling, or delaying: with alacrity: WILLINGLY . . .

> b: with fairly quick efficiency: without needless loss of time: reasonably fast: SPEEDILY . . .

> c: with a fair degree of ease: without much difficulty: with facility: EASILY . . .

Webster's Third New Int'l Dictionary (1961). As with most words, the dictionary gives multiple definitions. But we do not ascertain ordinary meaning in the abstract. Rather, we must decide which of these definitions, if any, is consistent with the context of the statute. *United States v. Turkette*, 452

---

[4]Although the district court deferred to the ATF's definition of "machinegun," we need not follow that route. Instead, because the statute is unambiguous, we simply follow the standard course of applying the definition to the facts. *See Reynolds v. Hartford Fin. Servs. Group, Inc.*, 435 F.3d 1081, 1092 (9th Cir. 2006) ("As the statute's text is clear, we need not resort to either the agency's interpretations or the statute's legislative history.").

U.S. 576, 581-83 (1981) (construing statutory text according to the context of the language and the structure of the statute); *Carter*, 421 F.3d at 912-13 & n.1 (excluding irrelevant alternative dictionary definitions in construing a term's ordinary meaning). As Chief Justice Traynor of the California Supreme Court observed, words rarely have an objective meaning divorced from the context of their usage. *See Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 38 (1968) ("The meaning of particular words or groups of words varies with the verbal context and surrounding circumstances . . . . A word has no meaning apart from these factors; much less does it have an objective meaning, one true meaning.") (quotation marks and alterations omitted). We thus agree with the Sixth Circuit that "readily restored . . . must not be construed as an abstract phrase, but rather its contours should be determined in the context of what it means to be able to 'readily restore' a machinegun as opposed to some other object." *One TRW*, 441 F.3d at 422 (alterations omitted).

[3] Regarding the term "readily," we conclude that the last two definitions in Webster's Third—definition "b" relating to a temporal component of speed and definition "c" relating to a methodological component of ease—capture the ordinary meaning of the term in the context of § 5845(b). The first definition in Webster's Third—relating to willingness—is directed towards an actor's mental disposition and is obviously inapposite. We conclude that, for purposes of § 5845(b), the plain and unambiguous ordinary meaning of "readily" may be defined by a temporal component ("with fairly quick efficiency: without needless loss of time: reasonably fast") or a component related to a manner or methodology ("with a fair degree of ease: without much difficulty: with facility).[5] *See*

---

[5]The Oxford English Dictionary describes both elements in its second definition: "promptly, in respect of the time of action; quickly, without delay; also, without difficulty, with ease or facility." *Http://www.oed.com/* (last visited April 28, 2006).

*One TRW*, 441 F.3d at 422 (" '[R]eadily' is a relative term, one that describes a process that is *fairly* or *reasonably* efficient, quick, and easy, but not necessarily the most efficient, speedy, or easy process.").

It does not matter whether the ordinary meaning requires both the temporal and methodological components because, as discussed below, each is present in this appeal. We note, however, that alternative definitions are typically presented in the disjunctive, lending credence to the proposition that only one component need be met to be considered "readily." In addition, the ease of restoration does, at least, indirectly implicate the time necessary for such restoration.[6] We now turn to the term "restored."

**[4]** Webster's Third lists multiple alternative definitions for "restore[d]" with the only relevant definition providing: "3: to bring back to or put back into a former or original state." Brown does not contest that this definition is the plain and unambiguous ordinary meaning of "restored" as used in the context of § 5845(b).[7] Instead, the dispute lies in the application of the undisputed facts to the ordinary meaning of "readily restored."[8]

---

[6]In *One TRW*, the court laid out a list of several elements that have been considered by courts in construing "readily," including time, ease, and equipment necessary for the restoration. 441 F.3d at 422.

[7]The etymology of the word "restore" also provides support for this plain meaning. The term derives from Latin *restaurare*, which means "to renew, *rebuild*, alteration of." Merriam-Webster online, *http://www.m-w.com* (last visited April 28, 2006) (emphasis added).

[8]We are not persuaded by Brown's attempts to cast doubt upon the ordinary meaning of "readily" by referring to snippets of legislative history from failed legislative efforts that predate § 5845(b). *See Whitfield v. United States*, 543 U.S. 209, 215 (2005) ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history."); *US West, Inc. v. United States*, 48 F.3d 1092, 1101 (9th Cir. 1994) (stating that "failed legislative proposals and [accompanying] recommendations in committee reports

To benchmark the question whether the rifle is "restored" (or "restorable"), we must identify the "former or original state" of the rifle. Brown claims that the "original state" of the rifle, for purposes of this analysis, is as remanufactured by MKS. Thus, according to Brown, the rifle in its "original state" did not fire automatically and any changes to the rifle that give it automatic capability are modifications from its original state and not a restoration. Although Brown's argument has some intuitive appeal, it is an effort to split semantic hairs and ignores the reality that the rifle was put together from two halves of what were undeniably automatic weapons —namely M-14s. It would lead to an absurd consequence if someone could escape the ordinary meaning of "restored" by simply cutting a machinegun in half, modifying it, and remanufacturing it into a functional firearm that is capable of being made to fire automatically.

[5] The rifle need not be a duplicate of the original or even meet the original specifications to qualify as being "restored." *See One TRW*, 441 F.3d at 424 ("[T]he definition of 'restore' does not preclude an object from being considered 'restored' without returning it to a condition in which it previously existed."). The fact is that the rifle, when modified, is a rebuilt machinegun.

[6] The United States argues, and we agree, that the "former or original state" of the rifle refers to the essential definition of a machinegun, that is whether it was ever capable of firing automatically more than one shot, without manual reloading, by a single function of the trigger. This condition

. . . . [are not] sufficient evidence to suggest that there is any relevant congressional intent to which this court could defer."), *judgment vacated on other grounds*, 516 U.S. 1155 (1996). Nor is this a case where we might deviate from the rule expressed in *Whitfield* as there is no "clearly expressed legislative intent to the contrary" of the plain and unambiguous statutory language. *Turkette*, 452 U.S. at 580 (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)).

is met because it is undisputed that the rifle was manufactured from two M-14 machinegun halves. *Id.* at 425 ("[T]he M-14 parts from which the [firearm] was manufactured had once been part of an M-14 weapon that fired automatically. Therefore, modifying the [firearm] to fire automatically would constitute 'restoration.' "). If the rifle is able to be "readily" brought back into this "former or original state," the rifle falls within the ordinary meaning of "readily restored" as used in § 5845(b).

Although Brown's rifle did not fire automatically when remanufactured or seized, the ATF report shows that an identical firearm (another MKS M-14A) was made to shoot automatically in forty-five minutes using common tools consisting of a hand grinder (or dremel tool), a splitting disk, a drill press, and hand files. After this procedure, the firearm was test fired twice, both times firing "automatically 3 shots with a single function of the trigger." Brown's expert, Michael Kelly, Sr., who is also the owner of the remanufacturer, MKS, does not materially disagree with the ATF's conclusions. Kelly testified in his deposition that the restoration process described in the ATF report would restore the rifle to a fully automatic function.[9] Kelly's only objection was that a weld process step was missing, which could be done with a variety

---

[9]Brown challenges consideration of the ATF report on summary judgment claiming that it did not comport with Federal Rule of Civil Procedure 56(c). This argument has no traction. The government attached the report to documents filed in support of its motion for summary judgment and also filed a declaration authenticating the report. The court may consider properly authenticated and admissible evidence on summary judgment. *See Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773-74, 778 n.24 (9th Cir. 2002). In any event, Brown's admissions through the deposition testimony of his expert Kelly are sufficient to establish the restoration process for the rifle. *United States v. One 1985 Cadillac Seville*, 866 F.2d 1142, 1147 (9th Cir. 1989) (stating that the appellate court may affirm a summary judgment grant of forfeiture "on any ground supported by the record"); *see also One TRW*, 441 F.3d at 420-21 (deciding whether the firearm was "readily restorable" based on the claimant's expert testimony).

of welding equipment (including a simple stick weld) and that this additional step would only increase the total restoration time from forty-five minutes to about two hours.

[7] For purposes of summary judgment, we accept the process and time frame offered by Kelly in his deposition.[10] A two-hour restoration process using ordinary tools, including a stick weld, is within the ordinary meaning of "readily restored." As to the temporal component, two hours, while not an insignificant amount of time, is still within a range that may properly be considered "with fairly quick efficiency," "without needless loss of time," or "reasonably fast." As to the means of restoration, requiring the use of ordinary tools and a stick weld, even by a skilled worker, is likewise within what may properly be considered "with a fair degree of ease," "without much difficulty," or "with facility."[11]

---

[10]Brown later submitted a declaration by Kelly, dated after the deposition, where Kelly lays out a complicated and technical process necessary to return the rifle to its *original* military specifications, a process where "[t]he total time required to make a modification to an MKS M-14A receiver would be about 5 hours +/- 30 minutes." This argument about the *original* military specifications misses the point. Section 5845(b) does not require complete or identical restoration; rather, it only requires that the rifle be "readily restored" to a state where it can shoot "automatically more than one shot, without manual reloading, by a single function of the trigger."

Significantly, Kelly's declaration does not refute his earlier conclusion about the two-hour period. Brown cannot create a genuine issue of material fact by submitting a contradictory declaration, which appears to be offered to avoid summary judgment. *See, e.g.*, *Silas v. Babbit*, 96 F.3d 355, 358 (9th Cir. 1996) ("One cannot create an issue of fact by simply contradicting one's own previous statement.").

[11]To the extent Brown argues that there is *some* ambiguity in "readily restored" because he can craft a narrower definition, we decline to hold the terms ambiguous or apply the rule of lenity. As we stated in *Lisbey v. Gonzales*, 420 F.3d 930, 933 (9th Cir. 2005):

Courts should not deem a statute ambiguous for purposes of lenity merely because it is possible to articulate a construction more narrow than that urged by the Government. Instead, courts have

**[8]** Our interpretation of the statute is in accord with the two other circuits that have considered the issue. *See One TRW*, 441 F.3d at 421-25; *United States v. Smith*, 477 F.2d 399 (8th Cir. 1973).**[12]** In the earlier case, the Eighth Circuit held that a firearm could be "readily restored to shoot automatically," *Smith*, 477 F.2d at 401, notwithstanding that "[t]o do so would take about an 8-hour working day in a properly equipped machine shop," *id.* at 400. In the recent Sixth Circuit case, the court undertook a careful statutory analysis and concluded that a MKS remanufactured M-14 that "could be restored to fully-automatic-shooting capacity to manufacturer's specifications" in six hours was readily restorable under § 5845(b). *One TRW*, 441 F.3d at 422-23 & n.11.

**[9]** The statute encompasses firearms that can be readily restored to shoot automatically. The unambiguous scope of the statute is not limited to instantaneous or on-the-spot restorations nor does it require restoration to original specifica-

---

reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute.

(Citations and internal quotation marks omitted). There is no reasonable doubt that the rifle falls within the intended scope and plain meaning of "readily restored."

**[12]**We have not spoken directly on the meaning of "readily restorable." Instead, we have generically stated, without elaboration, that "[§ 5845(b)] was specifically designed to reach a case where a converted machine gun is missing a part that can easily be added to make it functional." *United States v. Daychild*, 357 F.3d 1082, 1102 n.28 (9th Cir. 2004). In another case, we held that "a rational trier of fact could conclude, beyond a reasonable doubt," that a weapon was "readily restorable" based on testimony "that a 'shaved off' disconnect, in conjunction with the polished interior surfaces . . . 'would convert it into fully automatic.' " *United States v. Alverson*, 666 F.2d 341, 345 (9th Cir. 1982). *Alverson* is not helpful in this appeal because the restoration was completely different and the opinion offers no details as to the time or equipment required for such a restoration.

tions. The key factor, which is satisfied here, is that the firearm can be readily restored to shoot automatically. We therefore affirm the district court's grant of summary judgment in favor of the United States.

**AFFIRMED.**