46 F.3d 1173
 310 U.S.App.D.C. 256, 97 Ed. Law Rep. 637
 AMERICAN SCHOLASTIC TV PROGRAMMING FOUNDATION, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION, Respondent.
School Board of Roanoke County; BellSouth
Telecommunications, Inc.; GTE Service
Corporation, Intervenors.
 Nos. 93-1652 to 93-1654.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 13, 1995.
Decided Feb. 10, 1995.
Rehearing and Suggestion for Rehearing In Banc
Denied June 5, 1995.*
 
 Petition for Review of an Order of the Federal Communications Commission.
 Charles Cervantes, Washington, DC, argued the cause for petitioners. With him on the briefs was Adrian Cronauer, Washington, DC.
 Joel Marcus, Counsel, F.C.C., Washington, DC, argued cause, for respondent. With him on the brief were William E. Kennard, Gen. Counsel, and Daniel McM. Armstrong, Associate Gen. Counsel, F.C.C., Washington, DC.
 William D. Freedman, Washington, DC, argued the cause for intervenors. With him on the joint brief was Gail L. Polivy, Washington, DC. Colleen M. Egan, Washington, DC, entered an appearance for intervenors School Bd. of Roanoke County, et al.
 Matthew R. Sutherland, Atlanta, GA, entered an appearance for intervenor BellSouth Telecommunications, Inc.
 Before EDWARDS, Chief Judge, WALD and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 Dissenting opinion filed by Circuit Judge SENTELLE.
 WALD, Circuit Judge:
 
 
 1
 On August 30, 1993, the Federal Communications Commission ("FCC" or "Commission") granted three school boards affiliated with a local telephone company licenses to provide wireless cable service on the Instructional Television Fixed Service ("ITFS") spectrum. These licenses were mutually exclusive with applications made by petitioners, three nonprofit educational organizations, who challenge the grant of these licenses to the school boards on several grounds. We conclude that (1) petitioners waived their challenge to the FCC's rule that wireless cable is not a "cable system" within the meaning of the Cable Communications Policy Act of 1984, Pub.L. No. 98-549, 98 Stat. 2779 (1984) ("Cable Act" or "Act"), by failing to raise it before the agency, (2) the Commission's interpretation, that Sec. 533(b) of the Cable Act, prohibiting telephone companies from providing video programming in their local services area, prohibits only the provision of video programming over a cable system, is a reasonable one, and (3) the FCC's conclusion that the school boards gave adequate assurances of funding is supported by the record and not arbitrary or capricious. Accordingly, we deny the petition for review.
 
 I. BACKGROUND
 
 2
 A. The Cable Act and Cross-Ownership Restrictions
 
 
 3
 Congress enacted the Cable Act in 1984 to "establish a national policy concerning cable communications." 47 U.S.C. Sec. 521(1) (1988). See also American Civil Liberties Union v. FCC, 823 F.2d 1554, 1557-60 (D.C.Cir.1987) (detailing background and purposes of Cable Act), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). The Act establishes a framework for state and local regulation of cable fees, rates, and service, mandates privacy and consumer protection safeguards for cable systems, and imposes a series of media cross-ownership restrictions. Among these cross-ownership restrictions is Sec. 533(b)(1), which prohibits a telephone company from providing "video programming" within its service area.
 
 B. Wireless Cable
 
 4
 Wireless cable operates by transmitting television signals over the microwave bands. Because it broadcasts on the microwave band, it is only accessible to users equipped with specialized antennas and converters. Since the general public lacks this equipment, wireless cable, like cable, offers a private, multi-channel distribution network. Wireless cable, however, operates without any cable or other physical connection between the operator and the viewer.
 
 
 5
 In a 1990 order, the FCC concluded that a "cable system" as used in the Cable Act "encompasses only video delivery systems that employ cable, wire, or other physically closed or shielded transmission paths ... outside individual buildings," and thus does not include wireless cable or a range of other technologies. In the Matter of Definition of a Cable Television System, 5 F.C.C.R. 7638, 7638 (1990).
 
 C. Instruction Television Fixed Service
 
 6
 The FCC reserves certain segments of the wireless cable microwave band for Instructional Television Fixed Service stations. ITFS stations are authorized to provide "educational, instructional, and cultural material" to students enrolled for credit, for use in training programs, for administrative activities, or in connection with other educational television systems. See 47 C.F.R. Sec. 74.931(a)-(d) (1993).
 
 
 7
 In order to make ITFS commercially viable, the FCC allows the instructional stations to lease excess capacity to commercial stations. These leasing arrangements are subject to several restrictions, including, for instance, the requirement that the station air at least twelve hours per week of actual ITFS programming during the first two years of operation, and twenty hours thereafter. See id. Sec. 74.931(e).
 
 
 8
 With certain limited exceptions not relevant here, only accredited educational institutions and nonprofit organizations with educational purposes are eligible for ITFS licenses. See 47 C.F.R. Sec. 74.932 (1993). Where more than one eligible institution applies for a mutually exclusive license, the FCC chooses among them based on a point system, which awards points to applicants if they are, among other things, physically located in the community or an accredited school. The applicant with the highest number of points is awarded the license. See 47 C.F.R. Sec. 74.913 (1993).
 
 
 9
 This case involves competing applications for three ITFS licenses in the Roanoke, Virginia area. In November, 1991, each of three nonprofit educational organizations applied for one of the licenses. Shortly thereafter, three local school boards in affiliation with Botetourt Communications, Inc. ("BCI"), the parent company of a local exchange telephone service provider, applied for the same licenses. In each case, because the school board affiliated with BCI was local and an accredited educational institution, whereas the nonprofit organization was neither, the school board received a greater number of points.
 
 
 10
 In connection with their applications, the nonprofit organizations--the American Scholastic TV Programming Foundation, the American Foundation for Instructional Television, and the Excellence in Education Network (collectively, "ASTV")--petitioned the FCC to deny the licenses to the school boards on two grounds: first, that the award of an ITFS license to entities affiliated with a local telephone company violates Sec. 533(b) of the Cable Act, which prohibits telephone companies from providing video programming in their local service areas; and second, that the school boards failed to meet the FCC's requirement of establishing "reasonable assurances of funding." The FCC rejected ASTV's petitions to deny and awarded the licenses to the school boards. See In re Applications of Botetourt County School Board, American Foundation for Instructional Television, 8 F.C.C.R. 6265 (1993); In re Applications of Excellence in Education Network, Salem City School Board, 8 F.C.C.R. 6269 (1993); In re Applications of School Board of Roanoke County, American Scholastic TV Programming Foundation, 8 F.C.C.R. 6273 (1993).[1] We affirm.
 
 
 11
 II. SECTION 533(b)'s VIDEO PROGRAMMING PROHIBITION
 
 
 12
 Section 533(b)(1) of the Cable Act provides that:
 
 
 13
 It shall be unlawful for any common carrier ... to provide video programming directly to subscribers in its telephone service area, either directly or indirectly through an affiliate owned by, operated by, controlled by, or under common control with the common carrier.
 
 
 14
 The Cable Act defines "video programming" as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 U.S.C. Sec. 522(19) (Supp. V 1993).
 
 
 15
 The Commission ruled that Sec. 533's prohibition does not extend to video programming via wireless cable, and thus does not prevent the grant of licenses to the school boards affiliated with BCI, a telephone company parent. The Commission reasoned that, though the terms of Sec. 533(b) suggest no limitation on the type of video programming prohibited, the structure of the statute as a whole and its legislative history indicate that Congress meant only to prohibit "video programming" over a cable system. The Commission relied primarily on Sec. 533(b)'s placement within the Cable Act, the general purpose of which is " 'to establish a national policy concerning cable communications.' " Botetourt County School Board, 8 F.C.C.R. at 6266 (quoting 47 U.S.C. Sec. 521(1)), to conclude that Sec. 533(b) was concerned solely with the provision of video programming over cable systems. It drew support for this interpretation from the legislative history of the Cable Act, which explains that " '[i]t is the intent of section [533(b) ] to codify current FCC rules concerning the provision of video programming over cable systems by common carriers.' " Id. at 6267 (quoting H.R.REP. NO. 934, 98th Cong., 2d Sess. 56 (1984), reprinted in 1984 U.S.C.C.A.N. 4655, 4693 (emphasis added)). It concluded that the intent behind the definition and use of the term "video programming" in the Act was to describe one type of cable service, rather than to encompass video programming by all means of transmission. The Act's definition of video programming, it reasoned, "refers to the nature of the programming offered on a cable service, not the means of transmission. A cable system is capable of transmitting not only video programming, but also audio, data, and a variety of other signals. The definition in subsection [ (19) ] merely specifies a particular service provided by cable systems." Botetourt County School Board, 8 F.C.C.R. at 6267 n. 6.
 
 
 16
 ASTV counters this interpretation of Sec. 533(b), offering two alternative arguments for the inclusion of wireless cable within Sec. 533(b)'s prohibition. First, assuming that Sec. 533(b) only restricts video programming by a cable system, ASTV argues that wireless cable is a cable system within the meaning of the Act and that the Commission erred in ruling to the contrary. Alternatively, ASTV argues that Sec. 533(b) is not limited to video programming over a cable system, but that it prohibits all video programming by a telephone company in its service area, regardless of the means of transmission.
 
 A. Waiver of the "Cable System" Argument
 
 17
 We do not consider the first argument, that wireless cable is a "cable system" under the Act, because ASTV failed to raise it before the Commission in the proceedings below. The Commission's determination that wireless cable is not a "cable system" within the meaning of the Act dates from a 1990 order issued subsequent to a Notice of Proposed Rulemaking. See In the Matter of Definition of a Cable Television System, 5 F.C.C.R. 7638 (1990). ASTV did not challenge this rule in the proceedings below. Rather, it confined itself to what is now its second argument--that Sec. 533(b) prohibits telephone companies from providing video programming of any type, regardless of whether it is video programming by cable. This court cannot revisit the Commission's 1990 ruling when the Commission had no opportunity to do so below.
 
 
 18
 The Communications Act requires that the Commission rule on issues of law or fact before they are subject to judicial review. Section 405(a) provides that:
 
 
 19
 The filing of a petition for reconsideration [before the Commission] shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review ... (2) relies on questions of fact or law upon which the Commission ... has been afforded no opportunity to pass.
 
 
 20
 47 U.S.C. Sec. 405(a) (1988). "We have construed this section as codifying the exhaustion of administrative remedies doctrine, which 'requires complainants, before coming to court, to give the FCC a fair opportunity to pass on a legal or factual argument.' " American Tel. & Tel. Co. v. FCC, 974 F.2d 1351, 1354 (D.C.Cir.1992) (quoting City of Brookings Mun. Tel. Co. v. FCC, 822 F.2d 1153 (D.C.Cir.1987)).
 
 
 21
 ASTV argues that Sec. 405's exhaustion requirement is satisfied because the argument it now presses was raised before the Commission by other parties in 1990. We have held that parties may satisfy the exhaustion requirement by relying on the fact that another party to the same proceeding raised a particular argument. See Cellnet Communications Inc. v. FCC, 965 F.2d 1106, 1109 (D.C.Cir.1992). Where the issue was raised only by parties to another proceeding that took place three years earlier, however, the bounds of vicarious exhaustion have been exceeded. That an agency at one time considers and rejects certain arguments does not mean that the agency can thereafter be bypassed. Respect for the agencies' role under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), requires that the Commission have a fair opportunity to pass on ASTV's challenge--which amounts, in effect, to a request for reconsideration of a rule three years after its adoption--just as it must have the fair opportunity to pass on other issues of law.[2] We therefore conclude that ASTV waived its challenge to the Commission's 1990 determination. For the purposes of this decision, we take as a given the Commission's rule that wireless cable is not a "cable system" within the meaning of the Act.
 
 B. The Scope of Section 533(b)
 
 22
 Assuming, then, that wireless cable is not a "cable system" within the meaning of the Act, we consider ASTV's alternative argument that the Commission erred in concluding that Sec. 533(b) only prohibits telephone companies from providing video programming via cable. Here, ASTV argues that the Commission's interpretation contradicts the plain language of the statute. As the Commission is interpreting a statute it is charged with administering, our review is guided by Chevron, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We must first determine whether the statute speaks to the precise question at issue. If so, our inquiry is at an end. If the statute is ambiguous, then we must determine whether the Commission's interpretation is a reasonable one. See 467 U.S. at 842-43, 104 S.Ct. at 2781-82.
 
 
 23
 Looking to the language of Sec. 533(b)(1) itself, there is nothing to indicate that it is anything but a blanket prohibition of all video programming, whether transmitted by cable or not. Our inquiry, however, does not end here, but must continue to "the language and design of the statute as a whole." Fort Stewart Schools v. FLRA, 495 U.S. 641, 645, 110 S.Ct. 2043, 2046, 109 L.Ed.2d 659 (1990) ("If, upon examination of 'the particular statutory language at issue as well as the language and design of the statute as a whole,' it is clear that the Authority's interpretation is incorrect, then we need look no further.") (quoting K Mart Corp v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988)). As we have observed in the past, "while the immediate statutory text is the 'best evidence' of congressional intent, the Court has never held that it is the only such evidence." Tataranowicz v. Sullivan, 959 F.2d 268 (D.C.Cir.1992) (citing cases for the proposition that court must examine context and design of statute as a whole in determining whether a term is ambiguous), cert. denied, --- U.S. ----, 113 S.Ct. 963, 122 L.Ed.2d 120 (1993).[3]
 
 
 24
 Upon examination of the statute as a whole, we find sufficiently strong indications that Congress meant only to reach video programming via cable to render the statute's use of the term "video programming" ambiguous. We start with Sec. 533(b) itself. In one of Sec. 533(b)'s subsections, Congress authorizes a waiver of the prohibition "[i]n those areas where the provision of video programming directly to subscribers through a cable system demonstrably could not exist except through a cable system " connected to a telephone company. 47 U.S.C. Sec. 533(b)(4) (1988) (emphasis added). Though, as a matter of pure logic, it could be that Sec. 533(b)(1) restricts all video programming and Sec. 533(b)(4) provides an exception only for certain types of video programming, we cannot think of any practical reason why the rule and the exception would not be coextensive. Admittedly, taken alone, this difference between the rule and the exception would not render the rule ambiguous. But, in combination with other indications of congressional intent discussed below, the exception does signal a lack of certainty about Congress' precise intended scope for the "video programming" bar.
 
 
 25
 Section 533(b) is found within Part II of the Act, entitled "Use of Cable Channels and Cable Ownership Restrictions." See Immigration and Naturalization Service v. National Center for Immigrants' Rights, 502 U.S. 183, 189, 112 S.Ct. 551, 556, 116 L.Ed.2d 546 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text."). In conformity with this title, each of the other "ownership restriction" provisions in the Act is unambiguously limited to cable operators. At the time Sec. 533(b) was enacted,[4] the additional ownership restrictions in this part--all codified at Sec. 533 of the U.S.Code--(1) made it unlawful for a person "to be a cable operator if such person ... owns or controls" a local television broadcast station, Cable Communications Policy Act of 1984, Pub.L. No. 98-549, sec. 2, Sec. 613(a), 98 Stat. 2779, 2785 (1984) (amended 1992), (2) empowered the Commission to prescribe cross-ownership rules "with respect to the ownership or control of cable system by persons who own or control other media of mass communications which serve the same community served by a cable system," id. Sec. 613(c), (3) denied states and franchising authorities the power to "prohibit the ownership or control of a cable system" because of a person's ownership or control of any media of mass communication, id. Sec. 613(d) (amended 1992), and (4) authorized a state or franchising authority to "hold any ownership interest in a cable system" provided it follows restrictions on the exercise of editorial control, id. Sec. 613(e).
 
 
 26
 The singular focus on the regulation of cable systems holds throughout the Act.[5] In addition to the purpose of "establish[ing] a national policy concerning cable communications," 47 U.S.C. Sec. 521(1), Congress declared five other purposes, all related solely to cable.[6] The regulatory provisions of the Act likewise relate solely to cable. The Act (1) empowers state and local franchising authorities to require cable operators to designate channel capacity for public, educational or governmental use, see47 U.S.C. Sec. 531 (1988), (2) requires cable operators to designate a certain percentage of their channel capacity to unaffiliated commercial operators, see 47 U.S.C. Sec. 532 (1988 & Supp. V 1993), (3) establishes a framework in which state and local authorities may exercise their franchising authority over the rates, fees, services and equipment of cable systems, see 47 U.S.C. Secs. 541-47 (1988 & Supp. V. 1993), (4) imposes penalties on the unauthorized reception of cable service communications, see 47 U.S.C. Sec. 553 (1988 & Supp. V 1993), and (5) imposes privacy, consumer protection, and equal employment opportunity requirements on cable operators, see 47 U.S.C. Secs. 551, 552, 554 (1988 & Supp. V 1993). The Act's unwavering focus on cable operators and systems inevitably puts in doubt the petitioners' proposition that Congress in Sec. 533(b)(1) alone sought to regulate beyond the scope of cable systems by restricting noncable "video programming" as well.
 
 
 27
 Finally, as we observed in Tataranowicz, 959 F.2d at 277, even where the language of a statute is "superficially clear, legislative history may call such apparent clarity into question." See id. at 277-78 (collecting cases); see also Building & Constr. Trades Dep't v. Department of Labor, 932 F.2d 985 (D.C.Cir.1991) (Under Chevron 's first step, "the plain language would seem to control the issue before us, unless there is evidence in the legislative history that Congress intended something else."); State of Ohio v. Dep't of the Interior, 880 F.2d 432 (D.C.Cir.1989) ("We next examine the legislative history of [the Act] to ascertain if there are any countervailing indications to our conclusion and also to check on Interior's assertions that certain parts of the history are inconsistent with our conclusion and so render the statute ambiguous within the meaning of Chevron."). In Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), for instance, the Court rejected the "literal reading" of Sec. 4 the Clayton Act, 15 U.S.C. Sec. 15, which authorizes a private damages action for "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." See 459 U.S. at 529-30, 103 S.Ct. at 904. The Court looked to the legislative history of the preceding Sherman Act to conclude that Sec. 4 was narrower than its language suggested, reasoning that it was originally enacted with the intent of preserving the common law background, which limited actionable injuries to a narrower range than that suggested by the language. See id. at 529, 531, 103 S.Ct. at 903-04, 904-05 ("The repeated references to the common law that preceded the enactment of the Sherman Act make it clear that Congress intended the Act to be construed in the light of its common-law background.").
 
 
 28
 In this case, the legislative history of the Cable Act strongly suggests that Congress did not intend the "video programming" prohibition to extend to noncable video programming. The House Report on the Act, formally adopted by both the House and Senate,[7] explains that the Act "[e]stablishes restrictions on the ownership of a cable system by ... local telephone companies." H.R.REP. NO. 934, 98th Cong., 2d Sess. 20 (1984) (emphasis added). Of Sec. 533(b), the Report states that it "prohibits a common carrier from selecting or providing the video programming to be offered over a cable system." Id. at 57 (emphasis added).
 
 
 29
 The Report's identification of the genesis of the Sec. 533(b) prohibition provides perhaps the strongest indication that the prohibition is limited to video programming by cable. "It is the intent of section [533(b) ]," Congress reported, "to codify current FCC rules concerning the provision of video programming over cable systems by common carriers, except to the extent of making the exemption for rural telephone companies automatic." Id. at 56 (emphasis added). The FCC rule that Congress intended to codify in Sec. 533(b) forbade telephone companies from "furnishing ... cable television service to the viewing public in its telephone service area," 47 C.F.R. Sec. 63.54 (1983), and could not have been more explicit in its limitation to cable television service.
 
 
 30
 Where the FCC precursor to Sec. 533(b) forbade telephone companies from providing "cable television service," Sec. 533(b) forbids instead "video programming." What, then, to make of this change? The House Report is consistent with the Commission's conclusion that Congress' intent in using the term "video programming" rather than "cable television service" was to narrow the bar to one type of cable service, rather than to expand the scope of the prohibition to all video programming, regardless of the transmission medium. The Commission concluded that the Act uses the term "video programming" "merely [to] specif[y] a particular service provided by cable systems." Botetourt County School Board, 8 F.C.C.R. at 6267 n. 6. The House Report establishes that Congress wanted to ensure that nonvideo programming cable services would not be covered by the restriction of Sec. 533(b). The Report details the nonvideo programming services that cable is able to provide, including voice and data traffic and at-home shopping, and explains that its prohibition on telephone company activities reaches only video programming:
 
 
 31
 Section [533(b) ] applies only to the provision of video programming directly to subscribers of such programming by common carriers....
 
 
 32
 The Committee intends that nothing in this section shall be construed to limit the telephone company provision of information services or other non-video programming, transmissions, or communications services....
 
 
 33
 H.R.REP. NO. 934 at 57.
 
 
 34
 In sum, our examination of the statute and its legislative history convinces us that Sec. 533(b) is, at the least, ambiguous as to whether its prohibition of "video programming" applies to noncable video programming. We arrive, accordingly, at the second step of Chevron analysis, and must determine whether the Commission's interpretation of the ambiguous provision is a permissible one. The same features of the statutory structure and legislative history, discussed above, that contribute to Sec. 533(b)'s ambiguity also lend strong support to the Commission's conclusion that Congress intended to regulate only video programming via cable.
 
 
 35
 ASTV argues in addition that the underlying purposes of the Cable Act support the application of Sec. 533(b) to wireless cable. Here we are in decidedly murky territory. Congress adopted Sec. 533(b) without legislative findings, explaining simply that its intent was "to codify current FCC rules concerning the provision of video programming over cable systems by common carriers," H.R.REP. NO. 934 at 56, and, of the Act's cross-ownership provisions in general, that they were intended "to prevent the development of local media monopolies, and to encourage a diversity of ownership of communications outlets." Id. at 55. There is currently a fierce debate over whether Sec. 533(b) as applied just to cable hinders or fosters competition and diversity in ownership. See, e.g., US West, Inc. v. United States, 48 F.3d 1092, 1102-04 (9th Cir.1994) (noting conclusions by the FCC and the Antitrust Division of the Department of Justice that Sec. 533(b) fails to promote competition and diversity). Given this economic policy debate, we certainly are in no position to determine whether applying Sec. 533(b)'s restriction to wireless cable would further the statutory goal of encouraging competition and diversity in ownership of communications outlets. Surely, resolution of this policy issue would require a detailed analysis of the wireless cable industry, which we neither have before us, nor should we appropriately deal with even if we did. Under these circumstances, we decline to infer from Congress' generally articulated purpose of increasing diversity in ownership of communications outlets that it intended Sec. 533(b) to apply to wireless cable as well as cable.
 
 
 36
 ASTV argues further that the obvious purposes of Sec. 533(b) are (1) to prevent telephone companies from having an interest in the local market for video programming services, because that interest would give them a motive to discriminate against unaffiliated cable companies by denying access to telephone poles for cable, or offering this access only on unfair terms, and (2) to prevent telephone companies from having the opportunity to cross-subsidize video programming services with revenues from their monopolistic telephone activities. The underlying dangers of pole access discrimination and cross-subsidization, it argues, are equally present whether a telephone company provides video programming through cable or wireless cable, and, therefore, the congressional purposes are served by the application of Sec. 533(b)'s prohibition to wireless cable programming. ASTV Brief at 31-32.
 
 
 37
 The two purposes identified by ASTV are those actually advanced by the Commission when it adopted the telephone-cable cross-ownership prohibition in 1970. See Chesapeake and Potomac Telephone Company v. United States, 42 F.3d 181, 186-88 (4th Cir.1994). Congress, however, has never in law or legislative history specifically adopted these purposes. ASTV is correct in pointing out that these purposes suggest no reason to distinguish between wireless cable and cable. But, given serious questions as to whether the two concerns underlying the FCC's original promulgation of the rule survive in light of industry and regulatory changes since 1970,[8] as well as the fact Congress itself has never embraced these purposes as its own, they provide too weak a reed for the inference pressed upon us by petitioners that Congress meant the video programming prohibition to extend to wireless cable. We find the Commission's more limited interpretation of Sec. 533(b) permissible.
 
 III. REASONABLE ASSURANCES OF FUNDING
 
 38
 Alternatively, ASTV challenges the Commission's conclusion that the school boards met the Commission's requirement of establishing "reasonable assurances" of funding. In assessing such determinations, "the court applies a deferential standard of review, affirming the agency's conclusions if they 'are supported by the record and ... are not arbitrary or capricious.' " Swan Creek Communications, Inc. v. FCC, 39 F.3d 1217 (D.C.Cir.1994) (quoting WHW Enterprises, Inc. v. FCC, 753 F.2d 1132, 1139 (D.C.Cir.1985)).
 
 
 39
 The Communications Act empowers the Commission to require license applicants to provide information on their financial qualifications. See 47 U.S.C. Sec. 308(b) (1988 & Supp. V 1993). Based on this authority, the Commission requires that license applicants show that they have "reasonable assurances" of funding. "Reasonable assurances" can fall short of a legally binding commitment. This court has held, for instance, that the FCC was obliged to find the reasonable assurances standard met when an applicant offered a bank's nonbinding letter stating that it would provide a loan upon licensing and the fulfillment of ordinary credit criteria. See Multi-State Communications Inc. v. FCC, 590 F.2d 1117, 1118-20 (D.C.Cir.1978), cert. denied, 440 U.S. 959, 99 S.Ct. 1501, 59 L.Ed.2d 773 (1979).
 
 
 40
 In this case, each of the school boards' funding for the ITFS comes from BCI, the telephone company to which they have agreed to lease excess capacity. Each school board has an agreement with BCI, under which BCI will finance the construction of its ITFS facilities and the school board will lease excess capacity on its four allocated channels to BCI. These agreements constitute the school boards' "reasonable assurances" of funding, and they give BCI numerous discretionary opportunities to terminate the agreement: (1) if the FCC does not provide the license to the school board, "or otherwise within six months of execution of the Agreement"; (2) upon breach or default by the school board; (3) within 120 days of execution of the agreement if circumstances exist "which would interfere with the Lessee's business plan"; (4) if BCI fails to obtain access, through similar excess capacity agreements, to at least 16 channels in the area; or (5) "at any time for any reason" provided BCI provides 6 months notice. See Airtime Lease Agreement at 20-22, reprinted in Joint Appendix ("J.A.") at 293-95.
 
 
 41
 ASTV argues that this agreement "is so littered with provisions allowing BCI to void the agreement in its discretion that the agreement provides no 'reasonable assurance' of 'present commitments' of construction and operation capital required by ... FCC Form 330 and case law." ASTV Brief at 36. The FCC rejected this argument, noting that "[i]t is common ... for an ITFS licensee to fund construction and operation of its facilities through an excess capacity lease. Indeed, the right to lease excess capacity came about as a result of our recognition that educational entities holding ITFS licenses often lack the financial wherewithal to build and operate ITFS systems." Botetourt County School Board, 8 F.C.C.R. at 6268.
 
 
 42
 We find no infirmity in the Commission's conclusions that the licensing contingency is reasonable, and that the unlimited option to terminate with six months notice is permissible because it provides the school boards time to find a replacement source of funds. We are, however, somewhat perplexed by the Commission's treatment of the 16-channel contingency--the provision that BCI can terminate if it fails to lease excess capacity on at least 16 channels.[9] The Commission determines that this contingency is acceptable by assuming that it is somehow limited by good faith: "[W]e do assume that parties to a contract such as the lease will operate in good faith, and thus we will not presume ... that BCI will terminate the agreement if it cannot conclude further leases for twelve channels." Botetourt County School Board, 8 F.C.C.R. at 6268. Good faith, however, does not prevent a party to a contract from terminating an agreement when the express conditions of a termination option are met.
 
 
 43
 Nevertheless, like the Commission, "we find nothing irregular in BCI's insistence that it requires excess capacity from sixteen ITFS channels to make its operation commercially viable." Id. Admittedly, this condition creates some risks to the school boards, but BCI has attested that it "is fully committed to the project and stands ready to proceed upon grant of the ... application[s]." Declaration of Robert F. Nay p 11, reprinted in J.A. at 52, 54. As the Commission's declared goal in authorizing excess capacity arrangements is to "creat[e] business relationships between educational institutions and wireless cable companies that would permit ITFS service to flourish," Botetourt County School Board, 8 F.C.C.R. at 6268, we believe the Commission is in the best position to determine the degree of risk--within bounds--that is acceptable in fostering these relationships. In this case, we have no reason to believe that the risk to the school boards is so great as to mandate a finding that the agreement lacks "reasonable assurances."
 
 IV. CONCLUSION
 
 44
 For the foregoing reasons, we find no error in the Commission's rejection of ASTV's petitions to deny and its grant of the licenses to the school boards.
 
 
 45
 Petition denied.
 
 SENTELLE, Circuit Judge, dissenting:
 
 46
 Although I am in agreement with most of the majority's careful opinion, my one area of disagreement is unfortunately outcome determinative. I join without reservation the majority's rejection of petitioner's late asserted attack on the Commission's construction of "cable system" under the Cable Communications Policy Act of 1984. Likewise, I am in complete agreement with the majority's conclusion that the school district's "reasonable assurances" of adequate funding easily survives our review. However, I am not so convinced as to the Court's upholding of the Commission's construction of the proscriptive language of 47 U.S.C. Sec. 533(b).
 
 
 47
 I agree with the majority that the proper framework for our analysis is dictated by Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As the majority notes, under that rubric, if "the statute speaks to the precise question at issue ... our inquiry is at an end." Op. at 1178, citing Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. Looking to the statute, I conclude that Congress has spoken to the precise question at issue. The statute renders it "unlawful for any common carrier ... to provide video programming directly to subscribers in its telephone service area, either directly or indirectly through an affiliate owned by, operated by, controlled by, or under common control with the common carrier." 47 U.S.C. Sec. 533(b)(1). The definition section of Cable Act defines "video programming" as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station." 47 U.S.C. Sec. 522(19) (Supp. V 1993). Applying this statutory definition to the statutory mandate of section 533, I can read nothing but an unambiguous bar to all provisions of video programming by a common carrier to subscribers in a telephone service area whether or not by cable. Therefore, I would conclude that our inquiry should be at an end.
 
 
 48
 We should invalidate the Commission's construction, allow the petition for review, and never reach the second step of Chevron. I do not find Fort Stewart Schools v. FLRA, 495 U.S. 641, 645, 110 S.Ct. 2043, 2046, 109 L.Ed.2d 659 (1990), supportive of departing from the plain meaning of the words of the statutory section. While in that case, the Supreme Court certainly sanctioned examination not only of "the particular statutory language at issue," but also "the language and design of this statute as a whole," id. at 645, 110 S.Ct. at 2046 (citations omitted), it did so in the context of instructing the use of the expanded examination when that greater context made it "clear that the [agency's] interpretation is incorrect." Id. Nothing in the Supreme Court's language changes the initial step of the Chevron analysis. A contextual examination, like the language of the words, is part of the Court's mission to "give effect to the unambiguously expressed intent of Congress." Id., quoting Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. As I read the language of Fort Stewart Schools, the Court in that case was sanctioning the use of context to resolve otherwise ambiguous language, not to create an ambiguity in an otherwise unambiguous statutory provision.
 
 
 49
 I do not suggest that it is never possible to look beyond the words of the provision in question to make patent an otherwise latent ambiguity. As the majority notes, we have "observed in the past [that] 'while the immediate statutory text is the "best evidence" of congressional intent, the Court has never held that it is the only such evidence.' " Op. at 1178, quoting Tataranowicz v. Sullivan, 959 F.2d 268 (D.C.Cir.1992). But I read our circuit law as elucidated in Tataranowicz as furthering the teachings of McCarthy v. Bronson, 500 U.S. 136, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991). That is, that we may "rel[y] on context to reject 'the most natural reading' of a statutory phrase." Tataranowicz, 959 F.2d at 276 (quoting McCarthy, 500 U.S. at 139, 111 S.Ct. at 1740). I do not read either circuit law or McCarthy as permitting us to rely on context to reject the only natural reading of a statutory phrase. Here, upon examination of the context, it still appears to me that the ban on provision of video programming by a common carrier to subscribers in its service area is absolute.
 
 
 50
 If the context and the structure of the statutory scheme as a whole rendered the apparent plain meaning either absurd or inconsistent with congressional goals, I might well join the majority's result. But I read the teaching of Tataranowicz and McCarthy as a form of the older doctrine that "where the literal reading of a statutory term would 'compel an odd result,' we must search for other evidence of congressional intent to lend the term its proper scope." Public Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 454, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989) (citations omitted). However, I agree with Justice Kennedy that this doctrine is a legitimate but narrow exception to "the normal rule" that "[w]here the language of a statute is clear in its application ... we are bound by it." Id. at 470, 109 S.Ct. at 2575 (Kennedy, J., concurring in judgment). I would further apply his reasoning that "[t]his exception remains a legitimate tool ... only as long as the Court acts with self-discipline by limiting the exceptions to situations where the result of applying the plain language would be, in a genuine sense, absurd." Id. at 471, 109 S.Ct. at 2575. Here I do not find that to be the case.
 
 
 51
 In the present case, I do not find the result of applying the plain language to be either absurd or inconsistent with the broader goals and structure of the statute. Whether Congress intended to prohibit common carriers from competing with cable systems in the provision of video programming by all means, as the words seem to state, it would be not at all absurd or unnatural for Congress to have placed that limitation on trade in the "cable ownership" section. Indeed, it would seem to me just as natural to place it there as if the restraint were the more limited one contemplated by the Commission's interpretation. I therefore do not find the expanded examination of the statutory scheme and its goal to bring to light some previously hidden ambiguity but rather to conflict with the plain language of the statute. Therefore, while it is entirely possible that Congress acted with the intent supposed by the Commission, it did not write a statute limited to that goal. I therefore would allow the petition for review.
 
 
 
 *
 Circuit Judge Henderson did not participate in this matter
 
 
 [1]
 The three memorandum opinions and orders are identical except for the names of the parties. Subsequent citations will be only to the first, Botetourt County School Board
 
 
 [2]
 Although the 30-day limitation on challenges to Commission orders had expired by the time of ASTV's petition before the Commission, see 47 U.S.C. Sec. 405, "a party who possesses standing may challenge regulations directly on the ground that the issuing agency acted in excess of its statutory authority in promulgating them" regardless of statutory time limits on challenges. NLRB Union v. FLRA, 834 F.2d 191, 195 (D.C.Cir.1987); see also Overland Express, Inc. v. ICC, 996 F.2d 356 (D.C.Cir.1993) ("[W]e generally allow claims ... that a regulation is in excess of statutory authority when raised as a defense to an agency enforcement action" irrespective of statutory time limits), vacated on other grounds, --- U.S. ----, 114 S.Ct. 2095, 128 L.Ed.2d 658 (1994); American Tel. & Tel. Co. v. FCC, 978 F.2d 727, 734 n. 7 (D.C.Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 3020, 125 L.Ed.2d 709 (suggesting the same for nonenforcement proceedings where the party is nevertheless harmed by application of the regulation)
 
 
 [3]
 In Tataranowicz, we addressed a statutory provision that the repeal of medicare benefits for certain services would "not apply to an individual receiving such services during" a set transition period. The agency had applied this exemption only to claimants who were eligible to receive medicare for the services during the transition period, not to those who were still receiving services, but whose benefits had already expired earlier in the year. 959 F.2d at 275-80. We acknowledged that this restriction on the applicability of the exemption was not written into the terms of the provision, and that, indeed, "[r]ead without inquiry into context, the provision appears unambiguous," and contrary to the agency's interpretation. Id. at 276. Nevertheless, based on a review of the statutory context and legislative history, we found that the intended scope of the restriction was ambiguous, and accordingly upheld the agency's decision under Chevron
 
 
 [4]
 The Cable Act of 1984 was amended in 1992, with some additions to Sec. 533, but none to Sec. 533(b). See Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102-385, Sec. 11, 106 Stat. 1486 (1992). Each of the amendments to Sec. 533 addresses cable-related ownership restrictions. Sec. 533(a)(2) applies to multichannel multipoint distribution service ("MDS"), a form of wireless cable, but only to the extent of making it unlawful for a cable operator also to hold an MDS license. See 47 U.S.C. Sec. 533(a)(2)
 
 
 [5]
 The 1992 amendments to the Act include some references to the "multichannel video market" generally, which would include wireless cable. See, e.g., 47 U.S.C. Sec. 548(a) ("The purpose of this section is to promote the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market...."). These amendments, of course, do not elucidate the intent of the earlier Act
 
 
 [6]
 See id. Sec. 521(2) (to "establish franchise procedures ... which encourage the growth and development of cable systems ..."); id. Sec. 521(3) (to "establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems"); id. Sec. 521(4) (to "assure that cable communications provide ... the widest possible diversity of information sources and services ..."); id. Sec. 521(5) (to "establish an orderly process for franchise renewal which protects cable operators ..."); id. Sec. 521(6) (to "promote competition in cable communications ...")
 
 
 [7]
 Both the House and Senate adopted the report as their explanations of the Act. See 130 CONG.REC. S24,285 (daily ed. Oct. 11, 1984), 130 CONG.REC. H12,245 (daily ed. Oct. 11, 1984)
 
 
 [8]
 In particular, Congress enacted the Pole Attachment Act in 1978, Pub.L. No. 95-234, 92 Stat. 35, which instructed the FCC to "regulate the rates, terms, and conditions for pole attachments," 47 U.S.C. Sec. 224(b)(1). The Commission's implementing regulations sharply vitiate the pole access discrimination concern by eliminating the danger of discriminatory pricing, though not denial of access. See Chesapeake and Potomac, 42 F.3d at 187-88; US West, Inc. v. United States, 48 F.3d 1092, 1095-96
 Many, including the FCC, also maintain that regulation and oversight independent of Sec. 533(b) prevents telephone companies from engaging in illegal cross-subsidization. See U.S. West, 48 F.3d at 1103-04 ("In its recommendation to Congress that Sec. 533(b) be repealed, the FCC concluded that 'existing safeguards ... constitute an effective means of preventing cross-subsidization.' ") (quoting In re Telephone Company-Cable Television Cross-Ownership Rules, 7 F.C.C.R. 5781, 5828-29 (1992)).
 
 
 [9]
 Each of the three ITFS licenses granted to the school boards covers four ITFS stations. Seven additional ITFS channels are available in the Roanoke area. FCC Brief at 6 n. 2