COURT OF APPEALS OF VIRGINIA

Present:  Judges O'Brien, Chaney and Callins
Argued at Alexandria, Virginia

**PUBLISHED**

SEAN MARQUISE HUGHES

v.      Record No. 1309-24-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE VERNIDA R. CHANEY
MARCH 24, 2026

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Carroll A. Weimer, Jr., Judge

Hasina A. Lewis (Lewis Law, PLLC, on brief), for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,[1]
Attorney General, on brief), for appellee.


A jury convicted Sean Marquise Hughes of multiple offenses arising from a drive-by

shooting: maliciously discharging a firearm at an occupied dwelling, attempted malicious

wounding, discharging a firearm from a vehicle, possession of a machine gun, using a firearm

during the commission of a felony, and two gang-related offenses.  On appeal, Hughes

challenges the trial court's denial of his motions to strike, arguing that the evidence was

insufficient to establish his identity as a shooter and that the Glock 27 recovered from his motel

room did not meet Code § 18.2-288(1)'s definition of "machine gun."

For the reasons that follow, this Court affirms.  We conclude that the circumstantial

evidence was sufficient for a rational factfinder to identify Hughes as a participant in the

shooting.  We further hold that a firearm equipped with an aftermarket selector switch designed

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

to enable automatic fire may satisfy the "designed to shoot automatically" prong of Code § 18.2-288(1), even if the weapon does not fire automatically during laboratory testing.

## BACKGROUND[2]

On the afternoon of April 19, 2023, Prince William County police received "a tip in reference to a live stream Instagram video" that "seemingly targeted the residence" at 3591 Wharf Lane. Detective Shailee Davis responded to the home to contact Kyla Johnson and her family because the police considered the post a "perceived threat." While Detective Davis was outside speaking with Johnson's mother, Monique Morton Garnett, a dark four-door vehicle came by and stopped in front of them, and the driver "started shooting at" them. Garnett testified that the driver was "wearing a ski mask," which was "[b]lack." The bullets penetrated the home and struck Johnson's grandmother, Patricia Morton.

Police recovered .40 caliber and 5.56 cartridge casings from the scene. Later that evening, police located a stolen black Hyundai Elantra with Maryland license plates on a nearby street, approximately a quarter mile from 1991 Partree, the address associated with Elijah Hadley, who was an associate of Hughes. The vehicle exhibited steering column damage consistent with having been "hot-wired."

During the investigation, Detective Darien Cupka reviewed the Instagram Live video that Hadley had posted earlier that afternoon. The video showed Hadley displaying a firearm and tapping on the rear of the firearm, while making statements such as "How am I hot? I'm with my men," "we kill them all," "fat bitch," and "she knows who we are." However, Detective

---

[2] "We recite the facts 'in the "light most favorable" to the Commonwealth, the prevailing party in the [circuit] court.'" *Pereira v. Commonwealth*, 83 Va. App. 431, 439 n.3 (2025) (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)). Doing so requires this Court to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

- 2 -

Cupka testified that Hadley was on "an ankle bracelet" and that "the active location of that device, and the historical location, that showed that the device had not left 1991 Partree throughout the day and was still pinging there." R. 901-04.

Detective Cupka, who investigated the potential threat posed by the Instagram post, testified that he recognized Hughes in the video because he had previously "met him face to face" and was familiar with his "face" and "voice" from prior interactions, phone calls, and recordings. R. 1232, 1250. He added that the firearm displayed in the video was an "ARP" or "automatic rifle pistol," explaining that it lacked a full stock, had a distinct muzzle brake, and used a dual-stake, single-feed magazine. R. 1034-35. Johnson, Hadley's former girlfriend, also testified that she interacted with Hadley during the livestream and recognized Hughes as Hadley's associate.

Hughes was arrested on May 25, 2023, at Motel 6 in Prince George's County, Maryland, in connection with the April 19 shooting. Officers executed a search of the two-bedroom motel room and recovered a Glock 27 handgun with an extended magazine, an AK-47-style rifle, a Beretta handgun, cash, jewelry, and Hughes's cellphone.

A forensic extraction of Hughes's cellphone revealed photos taken on the morning of April 19, 2023, including one showing an individual wearing the same necklace later found in the motel room. Other photos depicted Hughes with Hadley and another individual in possession of an AR-style pistol and a Glock 27 with an extended magazine, the same models of weapons seized during the search.

The phone extraction further showed that around 8:00 p.m. on April 19, the day of the shooting, Hughes searched for "Inside NOVA," "news," "crime," "police," and "Prince William." A phone note created at 8:33 p.m. that evening contained the statements, "Its ah switch ona bakk of this glokk 27," and "Went thru the rip shit wasnt silent." The extraction also

- 3 -

revealed the original photo used in a Facebook post stating, "Free my bruva. Hot ass bitxhes fukk GRANDMA," which was posted by Hadley. The original image was taken on Hughes's phone at 11:01 p.m. on April 19.

The Glock 27 recovered from Hughes' motel room was modified with a "selector switch" or "sear switch"[3] device, as the police described, which Detective Cupka testified is an aftermarket modification that allows guns to fire in fully automatic mode. R. 1034-35, 1044, 1236. The .40 caliber cartridge casings recovered from the Wharf Lane crime scene were later matched to the Glock 27. At trial, ATF forensic biologist Glenn Fahrig testified that DNA recovered from the .40 caliber casings indicated evidentiary support for the inclusion of Hughes and Hadley as possible contributors. Neither individual was identified as a contributor to the DNA found on the 5.56 cartridge casings from the crime scene. Hughes introduced a certificate of DNA analysis of the firearms recovered from the motel room, which excluded Hughes and Hadley as contributors to the Beretta handgun but did not exclude another associate of Hadley. Testing on the remaining firearms was inconclusive.

At trial, the Commonwealth called Dr. McCarthy as an expert "in the area of forensic firearm and ammunition examination and comparison." R. 756, 761. McCarthy testified that Commonwealth's Exhibit 64, the Glock 27 recovered from Hughes's motel room, was "in working order." R. 771-72, CW Ex. 64. McCarthy explained that the firearm was equipped with a selector switch, which she described as "a small device that is attached to the back of the slide." R. 772. She referenced the selector switch as an "after[]market part[]," stating that

---

[3] Detective Cupka and the firearms expert at trial, Dr. McCarthy, referenced the same device using different terms. Cupka describes it as a "sear switch," while McCarthy uses "selector switch." R. 756, 761, 772, 1034-35, 1236. For purposes of this opinion, we use "selector switch" except when quoting Cupka.

"[w]hen you purchase a firearm from the manufacturer . . . you can switch out [the] slide cover plate for a selector switch or some other conversion device." R. 775.

According to McCarthy, the selector switch "will convert a -- may convert a semi-automatic firearm to a fully automatic firearm." R. 772, 804. On redirect, in explaining the purpose of the switch, McCarthy stated, "[t]he selector switch is designed to convert a semi-automatic firearm to a fully automatic firearm." R. 804-05. While describing the mechanics of the firearm, she testified that

> [t]he selector switch has a metal rod, or like a leg, that will apply pressure to the trigger bar that is in the firearm. That will change the firing mechanism of the firearm so that with one pull of the trigger, the firearm will continuously fire, as long as ammunition is available and there is no malfunction.

R. 772.

McCarthy confirmed that, when she test-fired the Glock in the laboratory, she could not place it into fully automatic mode while it was in her possession. R. 803-04. She specifically testified, "in both positions, the firearm only functioned in semi-automatic mode." R. 773. When asked whether she could explain why the selector switch did not result in automatic fire, McCarthy stated:

> There was no request for examination on the selector switch, so I did not diagnose the reason why the selector switch was not functioning properly.
>
> Through our experience at the laboratory, we have encountered a variety of selector switches, and sometimes it could be from the design of the switch, a broken part, or a missing part.

R. 773-74. McCarthy added that she could not determine whether the firearm had previously functioned in fully automatic mode. She could "only explain the results of the testing that was conducted at the laboratory, and at the laboratory it only functioned in the semi-automatic mode." R. 774.

- 5 -

Following the Commonwealth's presentation of evidence, Hughes moved to strike and then renewed the motion after presenting his case. The trial court denied both motions and submitted the case to the jury. The jury then convicted Hughes of the charged firearm and related offenses.

ANALYSIS

On appeal, Hughes challenges the sufficiency of the evidence identifying him as a shooter and supporting his machine-gun conviction under Code § 18.2-290.[4] Code § 18.2-290 criminalizes the "[u]nlawful possession or use of a machine gun for an offensive or aggressive purpose," while Code § 18.2-288(1) defines "machine gun." Hughes's challenge to the Code § 18.2-290 conviction primarily rests on whether the Glock 27 met the statutory definition of "machine gun."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a

---

[4] Hughes also contends that the trial court's inquiry during deliberations about whether the jury could reach a verdict "within the next hour or so" created improper coercive pressure. This claim is procedurally defaulted because Hughes neither objected nor requested a cautionary instruction or mistrial when the remarks were made. *See* Rule 5A:18; *Humbert v. Commonwealth*, 29 Va. App. 783, 791 (1999); *Yeatts v. Commonwealth*, 242 Va. 121, 137 (1991). The ends-of-justice exception does not apply because Hughes fails to show clear, substantial, and material error or a grave injustice. *Merritt v. Commonwealth*, 69 Va. App. 452, 460 (2018); *Winslow v. Commonwealth*, 62 Va. App. 539, 546-47 (2013).

The record reflects that the court's comments were limited to scheduling: the judge asked whether deliberations would extend beyond 5:00 p.m., stated that if more than an hour was needed the jury would return Monday, and expressly assured the jurors, "I don't want to rush you." Nothing suggests the court urged a particular outcome, imposed a deadline, or commented on the evidence. The jury chose to continue deliberating and returned unanimous verdicts about an hour later. On this record, Hughes has not demonstrated that application of Rule 5A:18 would result in a miscarriage of justice.

reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Williams v. Commonwealth*, 278 Va. 190, 193 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We review the sufficiency of evidence supporting a conviction "in the 'light most favorable' to the Commonwealth." *Bowman v. Commonwealth*, 290 Va. 492, 494 (2015) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "[A]n issue of statutory interpretation is a pure question of law which we review de novo." *VACORP v. Young*, 298 Va. 490, 494 (2020) (alteration in original) (quoting *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007)).

## I. Sufficiency of Identity Evidence

For Hughes's first sufficiency of the evidence argument, we must consider whether any rational trier of fact could have found identity beyond a reasonable doubt. *See, e.g.*, *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022). The record contains several pieces of circumstantial evidence sufficient for a rational jury to find that Hughes participated in the drive-by shooting.

Hughes argues that the evidence was insufficient to identify him as a shooter because no eyewitnesses identified him as the shooter, and witnesses described the gunman only as a masked individual. He further notes the absence of fingerprint evidence. He also contends that DNA evidence identifying him as a "possible contributor" on one cartridge casing is insufficient to establish identity beyond a reasonable doubt.

The Supreme Court of Virginia and this Court have recognized that identity may be established entirely by circumstantial evidence. *See, e.g.*, *Commonwealth v. Presley*, 256 Va. 465, 470 (1998) ("[T]he existence of the criminal agency as the cause of death and the identity of

the agency may be established by circumstantial evidence." (quoting *Bowie v. Commonwealth*, 184 Va. 381, 390 (1945))); *Updike v. Commonwealth*, 184 Va. 862, 869 (1946) ("Of course the identity of the criminal agent may be established by circumstantial evidence. Eyewitnesses are not often present."); *see also Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999) (citing *Servis v. Commonwealth*, 6 Va. App. 507, 524 (1988) (explaining that *any* element of a crime, including identity, may be proved by circumstantial evidence)). Virginia does not distinguish between direct and circumstantial evidence, as the fact finder "is entitled to consider all of the evidence, without distinction, in reaching its determination." *Hudson*, 265 Va. at 512-13; *see also Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) ("[C]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." (alteration in original) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000))). The Commonwealth is therefore not required to produce direct evidence or eliminate every conceivable hypothesis of innocence. "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005).

Viewed in the light most favorable to the Commonwealth, the evidence established a cohesive circumstantial chain linking Hughes to the shooting. First, the jury heard evidence of Hughes's close association with Hadley, who had an identified motive connected to the victims and openly made threatening statements in an Instagram Live video filmed hours before the shooting. In that video, Hadley displayed a firearm and made statements including, "we kill them all" and "she knows who we are." Detective Cupka had also identified Hughes as present in that video based on his familiarity with his "face" and "voice" from prior "face to face" interactions, "phone calls," and recordings. R. 1232, 1250. The police also uncovered a photo

on Hughes's cellphone, which was used in Hadley's Facebook post the evening of the shooting, which stated, "Free my bruva. Hot ass bitxhes fukk GRANDMA." The jury could reasonably infer that the statements made during the Instagram Live video reflected planning or intent directed toward the drive-by shooting and that the Facebook post reflected the aftermath. It is also reasonable for the jury to conclude that "GRANDMA" referenced one of the women who was shot—Hadley's ex-girlfriend's (Johnson's) grandmother.

Second, the evidence connected Hughes to the firearm used in the shooting. Ballistics testing conclusively matched the .40 caliber cartridge casings recovered from the Wharf Lane scene to a Glock 27 recovered from the motel room where Hughes was arrested. That Glock was found on the same bed as Hughes's cellphone. Glenn Fahrig, a forensic biologist for Washington's ATF Forensic Science Lab, testified that, based on the "likelihood ratio" DNA analysis, there was "evidentiary support for the inclusion of Sean Hughes as a possible contributor" to DNA recovered from one of the .40 caliber casings. Fahrig also explained that Hughes's profile "aligns best with the first contributor position," which is the individual "contributing the most DNA" in the mixture. Given that Hughes was not excluded as a DNA contributor on the casings, the jury could consider the DNA evidence alongside the ballistic match and remaining circumstantial proof to identify Hughes as the shooter of the firearm.

Third, the digital evidence further tied Hughes to the shooting and the weapon used. Hughes's cellphone showed that, shortly after the shooting, he searched "Inside NOVA," "news," "crime," "police," and "Prince William." Around 8:33 p.m. that evening, a note created on Hughes's phone stated, "Its ah switch ona bakk of this glokk 27," and "Went thru the rip shit wasnt silent." The record also reveals that the Glock 27 recovered from the motel room was modified with a selector switch. R. 1044. A rational jury could interpret this note as a contemporaneous reference to the weapon used in the shooting and its firing characteristics.

Considering these facts in their totality, the absence of direct eyewitness identification or fingerprint evidence, as Hughes argues, does not render the Commonwealth's circumstantial proof insufficient. The jury was entitled to aggregate the ballistic evidence, DNA evidence, digital records, social-media content, and post-offense conduct, and to draw reasonable inferences from their combined force.

On this record, there was sufficient evidence for a rational trier of fact to conclude that Hughes was one of the shooters. The evidence is not speculative, nor is the record devoid of adequate proof of identity. Rather, it presents a coherent evidentiary narrative linking Hughes to the offense. Thus, the trial court did not err in denying Hughes's motion to strike and renewed motion to strike on this ground.

## II. Machine Gun Possession under Code § 18.2-290

Hughes next argues that the evidence was insufficient to support his machine gun possession conviction under Code § 18.2-290[5] because the Commonwealth failed to prove that the Glock 27 recovered from his motel room fell under Code § 18.2-288(1)'s definition of a "machine gun." He emphasizes that the firearm examiner, McCarthy, testified that when the gun was test-fired in the laboratory, "in both positions, the firearm only functioned in semi-automatic mode." R. 773. He maintains that the Commonwealth did not prove the "designed to shoot" prong because McCarthy did not diagnose why the selector switch did not function during testing, and could not testify that this particular Glock ever fired automatically. Hughes also contends that the record contains no evidence establishing when the selector switch was installed on the Glock 27, whether the switch was present at the time of the shooting, or whether he was

---

[5] Code § 18.2-290 states: "Unlawful possession or use of a machine gun for an offensive or aggressive purpose is hereby declared to be a Class 4 felony." Hughes does not separately contest the "offensive or aggressive purpose" element; his argument is that the Commonwealth failed to meet the statutory threshold requirement that the weapon was a "machine gun" under Code § 18.2-288(1).

- 10 -

the individual who installed it.[6] Hughes further asserts that the court improperly relied on its individual and extrajudicial knowledge of firearms and selector switches rather than the trial evidence when denying the motions to strike.

Finally, Hughes analogizes this case to *Taylor v. Commonwealth*, 78 Va. App. 147 (2023), in which this Court declined to extend Code § 18.2-287.4 beyond its terms based solely on a firearm's configuration, when the Commonwealth failed to prove that the weapon satisfied the statute's operative definition. Hughes argues that, by analogy, the mere presence of a selector switch on his Glock, particularly in light of McCarthy's testimony that the firearm "only functioned in semi-automatic mode" during testing, is insufficient to establish that the weapon was a "machine gun" under Code § 18.2-288.

The Commonwealth responds that Code § 18.2-288 covers not only weapons that in fact "shoot[]" automatically, but also weapons that have been configured or modified so that they are "designed to shoot" automatically, even if they malfunction or fail to do so during later testing. It argues that the statutory design prong applies to inoperable or imperfectly functioning machine guns, so long as they were made or modified to enable automatic firing.

On this record, Hughes's reliance on *Taylor v. Commonwealth* is misplaced. In *Taylor*, this Court held that the Commonwealth failed to prove that the defendant carried a "center-fire rifle or pistol" within the meaning of Code § 18.2-287.4. 78 Va. App. at 154-155. There, the

_____

[6] Hughes's temporal argument does not alter the dispositive question presented here—whether the firearm Hughes possessed met the statutory definition of a "machine gun" under Code § 18.2-288(1). The statute turns on the weapon's configuration and whether it "shoots or is designed to shoot" automatically, not on who installed it or when the modification occurred.

The record contains evidence supporting the inference that the switch was present before or during the offense. Detective Cupka testified that in the Instagram Live video posted earlier that day, Hadley was tapping on the rear of a firearm at the location Cupka identified as the selector switch. Hughes's cellphone note created the evening of the shooting stating, "Its ah switch ona bakk of this glokk 27," likewise reflects contemporaneous awareness of the switch's presence.

Commonwealth "presented no evidence or testimony that a Taurus PT 111 is a center-fire pistol," did not introduce the firearm into evidence, and presented no evidence that the pistol's center-fire characteristic could be determined from other attributes shown by the evidence. *Id.* at 155 (footnote omitted). In other words, the Commonwealth failed in *Taylor* to prove an express statutory characteristic of the weapon.

This case presents a different question. Code § 18.2-288(1) defines a "machine gun" as "any weapon which shoots or is designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." Thus, unlike *Taylor*, the relevant statutory inquiry here is not whether the Commonwealth proved an inherent firearm characteristic such as center-fire design. Nor does *Taylor* require that the Commonwealth prove successful automatic operation where the statute expressly reaches weapons "designed to shoot automatically." Instead, the "designed to shoot" prong focuses on the weapon's configuration and intended purpose. Here, the Commonwealth's proof did not rest on the mere presence of an accessory, but on evidence that the Glock 27 was physically modified with a selector switch, together with express testimony and other evidence bearing on that modification and its purpose. Accordingly, *Taylor* does not control the interpretation or application of Code § 18.2-288 in this case.

When reviewing the denial of a motion to strike, this Court considers whether, viewing the evidence in the light most favorable to the Commonwealth, any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014). "A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Id.* (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)). "What the elements of the offense are is a question of law that we review de novo." *Id.* (quoting *Lawlor*, 285 Va. at 223). "Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly

wrong." *Id.* (quoting *Lawlor*, 285 Va. at 223-24). "[I]f there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." *Id.* (quoting *Lawlor*, 285 Va. at 224).

Since Hughes's conviction under Code § 18.2-290 depends on whether the firearm qualifies as a "machine gun" under Code § 18.2-288(1), we must first determine the statutory meaning before assessing the sufficiency of the evidence .

A. *Interpretation of "Machine Gun" under Code § 18.2-288(1)*

Code § 18.2-288(1) defines "machine gun" as "any weapon which shoots *or* is designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." (Emphasis added).

"[A] court's interpretation of a statute is a pure question of law, reviewed de novo." *Wallace v. MJM Golf, LLC*, 86 Va. App. 663, 675 (2026). "[W]hen interpreting a[] . . . [statute], 'our primary objective is to "ascertain and give effect to legislative intent," as expressed by the language used.'" *Corzine v. Alexandria City Council*, 86 Va. App. 623, 630 (2026) (third alteration in original) (quoting *Berry v. Bd. of Supervisors*, 302 Va. 114, 127 (2023)). "[W]e must assume that 'the legislature chose, with care, the words it used when it enacted the relevant statute[.]'" *City of Va. Beach v. ESG Enters., Inc.*, 243 Va. 149, 153 (1992) (quoting *Barr v. Town & Country Props., Inc.*, 240 Va. 292, 295 (1990)). "As with all issues of statutory interpretation, we are bound by the plain language of the statutes at issue." *Wallace*, 86 Va. App. at 676 (quoting *Small v. Fannie Mae*, 286 Va. 119, 127 (2013)).

"Where the General Assembly has expressed its intent in clear and unequivocal terms, it is not the province of the judiciary to add words to the statute or alter its plain meaning." *McMillion v. Commonwealth*, 81 Va. App. 344, 349 (2024) (quoting *Couplin v. Payne*, 270 Va.

129, 137 (2005)). Courts must also "faithfully apply the [statute] 'by giving reasonable effect to every word used'" by the General Assembly and may not treat statutory language as surplusage. *Corzine*, 86 Va. App. at 630 (quoting *Antisdel v. Ashby*, 279 Va. 42, 48 (2010)); *see Antisdel*, 279 Va. at 48 ("We recognize that the General Assembly carefully selects the words contained in a statute, and we will not read a legislative enactment in a manner that renders any portion of that enactment useless.").

Reading the definition of a "machine gun" under Code § 18.2-288(1), as a whole, reveals that the statutory provision is written in the disjunctive. A weapon may qualify as a machine gun if it either (1) "shoots" automatically *or* (2) is "designed to shoot" automatically. The plain language of Code § 18.2-288(1) reveals nothing that limits the "design" to a manufacturer or to the weapon's original state. The statute refers broadly to "any weapon," not "any weapon manufactured as." Similarly, it states "is designed to shoot" not "was originally designed," which focuses on the weapon's configuration rather than on who designed it, when the modification occurred, or whether the weapon successfully fired automatically at the moment of seizure or in laboratory testing.

If "designed to shoot" excluded modifications, then the phrase would add nothing beyond "shoots" and the statute would criminalize only successfully functioning automatic weapons— contrary to its public-safety purpose. Such a reading collapses the disjunctive use of the term "or" and renders that phrase redundant, contrary to settled principles of statutory interpretation. *See, e.g.*, *Antisdel*, 279 Va. at 48 ("[W]e will apply an act of the legislature by giving reasonable effect to every word used."). Our interpretation also aligns with the broader statutory scheme governing machine guns. *See* Code § 18.2-290 (declaring that possession or use of a machine gun for an "offensive or aggressive purpose" constitutes a Class 4 felony). By criminalizing possession tied to aggressive purpose under Code § 18.2-290, the General Assembly

demonstrated a heightened concern with the dangers posed by weapons configured for automatic fire. Reading Code § 18.2-288(1) to exclude weapons modified for automatic fire would undermine that statutory design.

Although interpreting the "designed to shoot" phrase in Code § 18.2-288(1) is a matter of first impression,[7] Virginia precedent supports that a weapon's design may be altered through aftermarket installations and that temporary inoperability does not remove a weapon from a prohibited-weapon statute.

In *Rogers v. Commonwealth*, 14 Va. App. 774, 776 (1992), this Court held that a sawed-off shotgun fell within the statutory definition, for a conviction under Code § 18.2-300, even though it lacked a firing pin and could not fire when seized. Code § 18.2-299 defines a sawed-off shotgun as "any weapon, loaded or unloaded, originally designed as a shoulder weapon, utilizing a self-contained cartridge from which a number of ball shot pellets or projectiles may be fired simultaneously . . . by a single function of the firing device[.]" The Court reasoned that the statute addressed the weapon's design and configuration, not its momentary inoperability, and emphasized the General Assembly's concern with the inherent danger posed by such weapons. *Rogers*, 14 Va. App. at 776-77.

---

[7] This Court's conclusion is not undermined by *Garland v. Cargill*, 602 U.S. 406, 410 (2024), in which the United States Supreme Court held that a bump stock does not convert a semi-automatic rifle into a "machine gun" under federal law. Similarly to Code § 18.2-288(1), "The National Firearms Act of 1934" defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." *Id.* (quoting 26 U.S.C. § 5845(b)). The Court emphasized that a bump stock merely accelerates repeated trigger functions rather than enables multiple shots from a single function of the trigger. *Id.* at 415.

Here, by contrast, the Commonwealth's expert described a selector switch that alters the firearm's internal firing mechanism so that a single trigger pull can produce continuous fire. R. 772. The expert specifically testified that a "selector switch has a metal rod, or like a leg, that will apply pressure to the trigger bar *that is in the firearm*. That will change the *firing mechanism* of the firearm so that with *one pull of the trigger* the firearm will continuously fire[.]" R. 772 (emphases added). *Cargill*, therefore, does not control the analysis.

*Rogers's* reasoning that temporary inoperability does not defeat statutory coverage applies with equal force to Code § 18.2-288(1)'s "designed to shoot prong" because as in *Rogers*, the statutory focus is on the weapon's design and configuration, not on whether it functioned as intended at the moment it was seized or laboratory tested. Code § 18.2-288(1) similarly contains no requirement that the weapon successfully fire automatically at a particular time. The fact that the Glock 27 recovered from Hughes's motel room functioned only in semi-automatic mode during laboratory testing does not resolve whether it was "designed to shoot automatically." Thus, a later malfunction does not foreclose the design prong. As *Rogers* makes clear, both statutes reflect the General Assembly's concern with weapons configured for prohibited use, even when they are not immediately operable. *Rogers*, 14 Va. App. at 776.

Federal caselaw interpreting materially similar language provides persuasive guidance and supports our interpretation. Under the National Firearms Act ("NFA"), 26 U.S.C. § 5845(b), a "machine gun" includes a weapon that "shoots, [or] is designed to shoot" automatically. Although the NFA does not define "designed to shoot," federal courts construing that term have held that it encompasses weapons possessing features intended to facilitate automatic fire, even if they do not currently fire automatically. *See, e.g.*, *United States v. TRW Rifle 7.62X51 mm Caliber, One Model 14*, 447 F.3d 686, 688 n.2 (9th Cir. 2006) (explaining that the Bureau of Alcohol, Tobacco, Firearms and Explosives' rulings provide that "designed to shoot" under 26 U.S.C. § 5845 includes weapons that "possess design features which facilitate automatic fire by *simple* modification or elimination of existing component parts" (emphasis added)); *S.W. Daniel Inc. v. United States*, 831 F.2d 253, 254 (11th Cir. 1987) (same); *see also United States v. Husain*, 117 F. App'x 353, 354 (5th Cir. 2004) (per curiam) (unpublished) ("Although the attempt to alter some of the guns to fire in the fully automatic mode failed, they were 'designed' *by alteration* to shoot . . . automatically." (alteration in original) (quoting 26 U.S.C. § 5845(b)));

- 16 -

*United States v. Gravel*, 645 F.3d 549, 552 (2d Cir. 2011) (recognizing that inoperability does not necessarily remove a weapon from the statute's "designed" prong).

These decisions reflect a judicial understanding that the "design" prong addresses a weapon's intended function or configuration, not merely its momentary operability or performance. Although not binding, federal authority may provide persuasive guidance where statutory language is materially similar. In this case, the parallel language between Code § 18.2-288 and 26 U.S.C. § 5845(b), along with the shared public-safety concern raised by automatic weapons, supports a consistent definition of "designed to shoot."

For these reasons, we conclude, on this record, the installation of a selector switch may constitute a "design" intended to alter a firearm's configuration to shoot automatically.

### B. *Sufficiency of the Evidence*

As explained above, a firearm modified with a device designed to enable automatic fire may satisfy the statutory definition of a machine gun even if it does not fire automatically during testing. The evidence in this record was sufficient for a rational jury to conclude that the Glock 27 recovered from Hughes's motel room was such a weapon. Although Hughes criticizes the trial court's references to its extrajudicial and personal familiarity with firearms and selector switches, the question on appeal is whether the evidence in the record is sufficient. Here, the independent record evidence and the expert testimony support the jury's finding that the statutory element of "designed to shoot" was satisfied.

At trial, McCarthy testified that the firearm "only functioned in semi-automatic mode" when test-fired with the selector switch "in both positions." R. 773, 790. That testimony does not resolve the design inquiry. She did not testify that the selector switch was ornamental, nonfunctional *by design*, or incapable of converting a firearm to automatic fire. Rather, McCarthy testified "[t]his device will convert a -- may convert a semi-automatic firearm to a

fully automatic firearm." R. 772. On redirect, she confirmed that "The selector switch is *designed* to convert a semi-automatic firearm to a fully automatic firearm." R. 804-05 (emphasis added). A reasonable juror could assign weight to this testimony from the expert firearm examiner that the purpose of attaching a selector switch to a weapon is to convert it into a "fully automatic firearm."

Additional evidence in the record supports the design prong of Code § 18.2-288(1). The Glock 27 was physically equipped with a "sear switch" mounted on its rear, which Detective Cupka testified is an aftermarket modification that allows guns to fire in fully automatic mode. R. 1034-35, 1236. When discussing the Instagram Live video, Cupka explained that the displayed firearm equipped with the "sear switch" was an "ARP" or "Automatic Rifle Pistol." R. 1034-35. Hughes's cellphone also contained a note created on the night of the shooting stating, "Its ah switch ona bakk of this glokk 27," and "Went thru the rip shit wasnt silent." A rational factfinder could reasonably interpret those statements as Hughes's own description of the weapon's configuration and firing characteristics, identifying a Glock 27 with a switch on its rear.

Taken together, the physical presence of the selector switch, expert testimony regarding the switch's purpose, and Hughes's contemporaneous description of a "switch ona bakk of this glokk 27" provide multiple strands of evidence that the firearm was modified for automatic fire capability. The Instagram Live video likewise depicts the rear of a firearm being tapped at the location Cupka identified as "sear switch." That the Glock 27 did not function as intended during McCarthy's testing does not negate the weapon's design or the purpose of selector switches, as testified to by McCarthy and Cupka.

Viewed in the light most favorable to the Commonwealth, the evidence was sufficient to support the jury's finding that the Glock 27 qualified as a "machine gun" under Code

§ 18.2-288(1). As a result, the evidence is similarly sufficient to support Hughes's conviction of "unlawful possession" of such a "machine gun" under Code § 18.2-290, as Hughes did not separately contest the "offensive or aggressive purpose" element. The trial court thus did not err in denying the motion to strike or the renewed motion to strike on this ground.

CONCLUSION

The record supports the jury's findings of identity and the machine-gun conviction. The evidence was sufficient for a rational factfinder to identify Hughes as one of the shooters and conclude that he knowingly possessed a Glock 27 modified with a selector switch. That configuration satisfied the "designed to shoot" prong of Code § 18.2-288(1)'s definition of a machine gun, supporting Hughes's conviction under Code § 18.2-290. This Court, therefore, affirms the trial court's judgment.

*Affirmed.*